IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

      V.

                                                                                    CASE NO.  5:14-CR-340-GTS

STEPHEN M. HOWELLS II,

            Defendant.
_____

## SENTENCING MEMORANDUM

DATED:     November 24, 2015          LISA A. PEEBLES
                                                    Federal Public Defender

                                   By:
                                              Randi J. Bianco
                                              Assistant Federal Public Defender
                                              Bar Roll No. 507514
                                              Clinton Exchange, 3rd Floor
                                              4 Clinton Street
                                              Syracuse, New York   13202
                                              (315) 701-0080

Stephen Howells comes before this Court as a very remorseful man who accepts responsibility for what he has done. Without any reservation, he understands that his criminal conduct has scarred the victims of his offenses and brought shame on his own family. Though his conduct is obviously reprehensible, he asks this Court to fashion a sentence that (1) accounts for the fact that he will serve a lengthy sentence in state court for the underlying sexual abuse and kidnapping; (2) focuses on the particular remaining federal interest involved in this case; and (3) places his conduct into relevant context.

## I.   PRELIMINARY STATEMENT

On November 12, 2014, Stephen Howells pled guilty to one count of Conspiracy to Sexually Exploit Children in violation of 18 U.S.C. § 2251(a) and (e); fifteen counts of Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a); and five counts of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and 2256(8)(A). None of the images were ever distributed. Stephen's sentencing is currently scheduled for December 17, 2015.

A Presentence Report ("PSR") was prepared by the United States Probation Department in anticipation of his sentencing. According to the PSR, his total Offense Level after receiving acceptance of responsibility is 43 and his Criminal History Category is I, resulting in a guideline imprisonment range of life. Stephen's highest offense, 18 U.S.C. § 2251(a), requires a mandatory minimum sentence of 15 years with a maximum term of 30 years.

Stephen has raised his objections to the factual contents contained in the PSR with probation. The defense submits that based on the arguments set forth below, a concurrent sentence of a total term of 30 years' imprisonment plus lifetime post-release supervision would

be "sufficient, but not greater than necessary," to achieve the statutory goals of punishment. U.S.S.G. § 3553(a).

The Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), held the sentencing guideline range to be only advisory. In determining a sentence, a court must not only consider Guideline calculations, but also take into equal account all other statutory concerns regarding the purposes of punishment listed in 18 U.S.C. § 3553(a)(2), as well as the unique circumstances of the Defendant. *See* § 3553(a).

The Sentencing Reform Act provides, in part, that:

> The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in this subsection. The Court, in determining the particular sentence to be imposed, shall consider-
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
> >
> > (2) the need for the sentence imposed-
> >
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > > (B) to afford adequate deterrence to criminal conduct;
> > > (C) to protect the public from further crimes of the defendant; and
> > > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

In light of *Booker* and the return of discretion to the Sentencing Courts, the defense respectfully requests that this Court fashion a sentence that (1) accounts for the fact that he will serve a lengthy sentence in state court for the underlying sexual abuse and kidnapping; (2) focuses on the particular remaining federal interest involved in this case; and (3) places his conduct into relevant context.

## II. THE NATURE OF THE OFFENSE, THE NEED FOR THE SENTENCE TO SATISFY THE REMAINING FEDERAL INTERESTS, AND STEPHEN'S HISTORY AND PERSONAL CHARACTERISTICS SUPPORT A COMBINED SENTENCE OF 30 YEARS' IMPRISONMENT.

Several factors support the sentence proposed of 30 years' imprisonment for the crimes for which Stephen is guilty, including the nature of the federal crimes he is to be punished for in this forum as opposed to the state crimes; Stephen's history and characteristics; and the fact that he released the girls, knowing that his capture was almost certain.

### 1. Nature of the federal offense

The nature of the offense involves coercing young minors to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct and thereafter possessing such visual depictions. While the nature of the federal offense is appalling, it pales in comparison to the underlying state charges. The state clearly has a more significant interest in prosecuting the kidnapping and sexual abuse charges than the federal court does in the filming of the sexual abuse, especially given the fact that the images were not distributed.

After his divorce and the breakup of his family, Stephen's doctor recommended he take time off work due to anxiety and insomnia issues, conditions which may have continued to affect Stephen thereafter.[1] This does not excuse Stephen's actions, but does shed light on factors that may have contributed to his behavior. In fact, Stephen maintains that at the time he committed the crime, he did not understand that he was hurting anyone, as he believed that the girls were "two-dimensional characters of real people." PSR at ¶65. Once Stephen realized the truth, that

---

[1] See Gregory Healy, M.D., *Office Visit Report*, Aug. 28, 2013; Gregory Healy, M.D., *Office Visit Report*, Sept. 5., 2013; Erik N. Schlosser, Ph.D., *Psychosexual Evaluation of Stephen Howells II* at 9 (Feb.18, 2015) submitted to the Court under separate cover.

4

he was hurting not only the victims, but also the people that he cared about in his own life, he released the girls fully understanding that it would likely lead to his capture. *Id.*

### 2. The Need for the Sentence Imposed to Satisfy the Purposes of Punishment

A sentence in federal court to the maximum of 30 years' imprisonment is significant and would satisfy the purposes of punishment under the Sentencing Reform Act. Such punishment should not take into account Stephen's state offenses, except to focus the issue on the residual federal criminal interest and prosecution. In state court, Stephen will be sentenced to a term of 25 years for the underlying sexual abuse and kidnapping charges with 20 years' post-release supervision. These state charges of sexual abuse and kidnapping do not implicate any federal interest because these acts were not done in or affecting interstate commerce or on federal property. The only federal interest not satisfied by the state sentence is Stephen's production, receipt, and possession of child pornography.[2]

As the produced images of the victims were not distributed to anyone else, the additional harm associated with the federal interest is certainly no more serious than the State's interest in prosecuting Stephen for the sexual abuse and kidnapping charges. Therefore, the remaining federal interest involved in this case would be amply satisfied by a sentence of 30 years' imprisonment. Stacking the sentences consecutively would be greater than necessary based on the remaining federal interest.

---

[2] While four of the victims were not addressed in the underlying state conviction, the District Attorney's office of St. Lawrence County was fully aware of these victims and had the opportunity to bring charges in regards to them. Evidently, however, the District Attorney's office felt that it would be in the interest of justice to offer the underlying state plea and sentence to satisfy all charges.

While the Sexual Exploitation of Children and Possession of Child Pornography statutes do target the actual use of a child to produce sexually explicit images, federal jurisdiction for 18 U.S.C. § 2251 arose from a concern with the spread of the Child Pornography industry across the country and internationally, implicating interstate commerce. S REP. NO. 95-438, at 5 (1977) (stating that "[c]hild pornography and child prostitution have become *highly organized, multimillion dollar industries that operate on a nationwide scale*" and that "because of the vast potential profits involved, it would appear that this sordid enterprise is growing at a rapid rate") (emphasis added).

Much of the focus of the original draft of the bill was on the astounding profitability of the industry, mainly the low cost of production coupled with the high prices these images fetch on the black market, the lack of laws protecting boys, and the connection between the industry and child prostitution. *Id.* at 6. While there was discussion about the need for federal legislation that addresses that actual abuse of the children, much of the focus was on the absence of state laws that prohibit the use of children in the production of child pornography. *Id.* at 10. Today, every single state has some kind of statute designed to protect children from sexual abuse. *Laws in Your State*, RAINN.ORG, https://apps.rainn.org/policy-app/index2.cfm (last visited Aug. 3. 2015). These state laws address child sexual abuse without regard to whether the activities are memorialized. This further focuses the federal scope of power on the interstate transport of children and images as a part of the production and possession of child pornography.

18 U.S.C. § 2251 has not significantly changed since the original law passed in 1978. Protection of Children Against Sexual Exploitation Act of 1977, PL 95-225 Feb. 6, 1978, 92 Stat 7; 18 U.S.C. § 2251. Besides modifications to sentence and terminology, *e.g.* PROTECT Act of 2003, PL 108–21 (S 151), sec. 103; Adam Walsh Child Protection and Safety Act of 2006, PL

109–248, July 27, 2006, 120 Stat 587 sec. 207, the current version of 2251(a) is not substantially different from the original law passed in 1978. *Compare* Protection of Children Against Sexual Exploitation Act of 1977, PL 95-225 Feb. 6, 1978, 92 Stat 7 *with* 18 U.S.C. § 2251.

### 3. Stephen's History and Characteristics

i) **Childhood**

The essence of Stephen's childhood can be summarized in two words: abuse and neglect. Stephen's very earliest memories were of his father verbally and physically abusing his mother.[3] Stephen was also the victim of sexual abuse at the hands of his father as a child. *Id.* at 6. After leaving the family for a man when Stephen was five or six, Stephen's father occasionally returned to their home and forced his mother to have sex, threatening to engage in this activity with the children if she refused him. *Id.* at 5. Stephen also remembers his father's apparent hatred of women, often referring to them in degrading terms. *Id.* at 10.

Stephen's mother also struggled with debilitating depression for which she received disability benefits throughout Stephen's childhood. *Id.* at 10. With both parents struggling with their own behavioral and mental conditions, the domestic disturbances continued between Stephen's mother and father throughout his childhood and young adult life. Oftentimes the custody and parenting affray would involve the school by requesting social services intervention or preventing one parent or the other from communicating with the children.[4] In addition to the abuse, every single member of the Howells family admits that the conditions in which Stephen lived were extremely neglectful. *Id.* at 6. With Stephen's father gone, the family moved

---

[3] *Schlosser Evaluation* at 5, submitted to the Court under separate cover.
[4] *Note from Vera Carpenter to Colton-Pierrepont Central School*, Feb. 7, 1990; *Letter from Stephen Howells, Sr. to School Nurse*, p. 1 (Nov. 2, 1988); *Letter from Stephen Howells, Sr. to School Principal*, p. 1 (Jan. 31, 1989),submitted to the Court under separate cover

constantly. In several of these childhood homes, Stephen lacked access to running water and indoor plumbing and the family lived in abject poverty throughout his youth. Id at 6. As a child and young man, Stephen remembers waking up freezing on cold winter nights to check on his younger siblings and make sure that they were all right. One of his brothers in particular struggled with bedwetting, and every night Stephen would wake him, help him change and put him back to bed with dry blankets. Because of the bedwetting, Stephen and his siblings often went to school reeking of urine.

Stephen and his siblings were bullied at school due to their unclean appearance and odor.[5] The urine stench caused the children to suffer socially and academically at school to such an extent that the nurse provided the boys with showers and clean clothes.[6] Stephen was held back twice, and had a high absenteeism rate throughout his schooling. *Id.* at 1.[7] When Stephen was in his early teens, he went to live with one of his teachers who volunteered to take him into her home, but later Stephen dropped out of school altogether. *Schlosser Evaluation* at 8.

The neglect was so severe that Social Services intervened on several occasions and at one point, the agency sent Stephen to live with his maternal aunt. *Id.* at 6.[8] Stephen also went to live with his aunt at another time, despite his mother's claims that he was mistreated there. *Schlosser Evaluation* at 8. During these stays, Stephen's cousin sexually abused him and later shot and killed himself while Stephen was living in the home. *Id.* at 6.

Despite the tumultuous and violent upbringing that formed the foundation of Stephen's life, he never received any psychological treatment to deal with the traumas he endured as a child

---

[5] *Letter from Stephen Howells, Sr. to School Nurse*, p. 1 (Nov. 2, 1988), submitted to the Court under separate cover.
[6] Kathryn Hayes, Health Report, 1988, submitted under separate cover.
[7] Specific Attendance Report, Norman Whyte High School (1990) submitted to the Court under separate cover.
[8] *Note from Vera Carpenter to Colton-Pierrepont Central School*, Apr. 17, 1990 submitted under separate cover.

and young adult. There is evidence, however, that Stephen is amenable to treatment, which in addition to the fact he would be quite elderly upon release, strongly supports a 30-year sentence as "sufficient, but not greater than necessary," to achieve the statutory goals of punishment.

   ii) **The Results of a Psychosexual Evaluation**

The Court has been provided with a Psychosexual Evaluation of Stephen that was conducted by Dr. Erik N. Schlosser over the course of three sessions in November and December of 2014. Dr. Schlosser's evaluation was both comprehensive and thorough, as he reviewed all of the materials in this case, conducted a lengthy interview with Stephen, performed psychological testing, and interviewed Stephen's parents and siblings.

The most compelling aspect of Dr. Schlosser's evaluation is his conclusion that Stephen possesses several positive qualities that indicate "a relatively smooth treatment process and a reasonably good prognosis." *Schlosser Evaluation* at 15. In addition to the remorse Stephen expressed during the evaluation, he also expressed a desire for treatment and an understanding of the pain and harm he had caused. *Id.* at 14. Stephen attempted to stop viewing child porn in the past, but could never do so without the aid of treatment nor did he receive therapy to deal with the violent and neglectful childhood he survived.

Part of the reason he did not seek psychiatric assistance for the trauma of his past was because of a lack of memory of his childhood. *Id.* at 18. Dr. Schlosser examined this phenomenon and found that "[i]t is fairly common for children raised in chaotic homes with violence and/or neglect to experience memory problems due to the interference of anxiety or fear in the brain's process." *Id.* These chronic memory problems were first recognized in Stephen in 2003. *Id.*

9

In addition to his highly treatable characteristics, Dr. Schlosser also found that Stephen was "very disclosing" and "open." *Id.* at 16. One test designed to assess self-reporting distortions found that Stephen's candor was highly "consistent with individuals honestly reporting their difficulties" and that there was "no evidence of exaggeration or feigning." *Id.*

Dr. Schlosser's evaluation concludes with his opinion, based on test results, that Stephen is "motivated to obtain treatment for his problems, is highly disclosing of his problems, and displays characteristics associated with those who engage in treatment in a meaningful manner." *Id.* at 19.

### iii) **Educational History**

In school, Stephen was diagnosed with a cognitive learning disability. [9] Despite this diagnosis and a turbulent home life, Steven earned his GED and later took advantage of the GI Benefits he was entitled to because of his military service. Stephen attended college, graduated with a nursing degree, and passed state exams to become a Registered Nurse.

### iv) **Employment History**

As a registered nurse, Stephen helped countless people in times of great need and vulnerability. He took his job very seriously and felt that his position allowed him to give back to his community by using the skills he gained in the military and nursing school to heal others. In the United States Air Force, Stephen served as a medic and has since always maintained a strong work history to provide for himself and his family.

---

[9] *Cumulative Health Record, Colton-Pierrepont Central School*, Oct. 1989 submitted under separate cover

v) **Military History**

In addition to recognizing employment history at the sentencing stage, the Second Circuit has also considered military service as supportive of a downward departure. *See United States v. Canova*, 412 F.3d 331 (2d Cir. 2005). In a similar case, the Third Circuit departed downward where the defendant, convicted for inducing a minor to perform illegal sex acts and receiving child pornography, had served in the Navy and had no criminal record. *United States v. Velasquez*, 329 Fed. Appx. 365 (3d Cir. 2009). As mentioned, Stephen served this country in the United States Air Force for four years as a medic and has no criminal record whatsoever.

vi) **Family Life**

Stephen has three children, ages 13, 9, and 6. Stephen cares for his children very much and never abused them. He was very involved in all of his children's lives and was always available to help with homework and educate and enrich their lives through hiking, fishing, and horseback riding.

One of Stephen's greatest regrets is the pain he has caused his family, especially his children. He hopes that someday, even if he is quite elderly at the time, he might be free to start making amends with them for the mistakes he has made.

vii) **Stephen's Age**

Stephen is presently 40 years old and, should the Court sentence him to 30 years, will be elderly when released. The Sentencing Commission has found that advanced age should be considered at sentencing and that there is an inverse correlation between recidivism rates and age. United States Sentencing Commission, *Measuring Recidivism: the Criminal History Computation of Federal Sentencing Guidelines*, (May 2004). The Sentencing Commission found that less than 10% of defendants over 50 years of age committed another crime. *Id.* at 28.

Controlling for criminal history category, only 6.2% of the defendants over age 50 that were in a Criminal History Category of I committed another offense. *Id.* at 28.

While there is some evidence that sex offenders pose a higher risk of recidivism than other criminal defendants, *see, e.g.*, *United States v. Hayes*, 445 F.3d 536, 537 (2d Cir. 2006) (citing H.R.Rep. No. 107-527, at 2 (2002), other studies focusing on sexual offenders found results similar to those found by the Sentencing Commission: recidivism decreases with age for all offender types. *See, e.g.*, R. Karl Hanson, *Age and Sexual Recidivism: A Comparison of Rapists and Child Molesters* (2001).

Even if the recidivism rates of the entire population of sex offenders are generally higher than the population of other criminal defendants, a point Stephen does not concede, studies have demonstrated that sex offenders receiving treatment are less likely to recidivate than sex offenders who remain untreated. *See*, *e.g.*, Karen Kersting, *New Hope for Sex Offender Treatment,* MONITOR ON PSYCHOLOGY (Aug. 2003); John Q. LaFond & Bruce J. Winnick, *Sex Offender Reentry Courts: A Proposal for Managing the Risk of Returning Sex Offenders to the Community*, 34 Seton Hall L. Rev. 1173, 1180-84 (2004).

Here, Stephen will likely participate in sex offender treatment while incarcerated and when released to supervision. As demonstrated by psychological evaluation, Stephen is very amenable to this treatment and will likely gain much from participating. Thus, his age, treatment opportunities, and post-release supervision indicate that the likelihood of his recidivism will significantly diminish and that 30 years would be a sentence sufficient, but not greater than necessary, to satisfy the remaining federal interests involved in this case.

> viii) **Stephen Released the Victims Despite Knowing the Likelihood that He Would Be Apprehended and Thereafter Cooperated Fully with Authorities.**

In imposing a sufficient sentence, we ask this court to consider Stephen's actions in releasing the victims in this case and his subsequent cooperation with law enforcement. Stephen immediately cooperated with law enforcement officers when he was arrested. He confessed his guilt, never minimized his conduct, and continuously accepting responsibility for his offense. In addition to pleading guilty to every offense charged in the indictment, he acknowledged his wrongdoing to the Probation Office and timely notified the government of his intent to enter a plea of guilty. As he states in his letter to the Probation Office, he has extreme remorse and shame for what he has done and is glad he was apprehended.

More significant than his acceptance of responsibility is the fact that Stephen released his last two victims knowing that he would likely be identified and apprehended after doing so. At the time of the offense, Stephen made no attempt to hide his identity. The victims knew what he looked like, what type of car he drove, and where he lived. When Stephen made the decision to release the victims approximately 24 hours after their abduction, he knew he would be arrested and imprisoned.

## III. CONCLUSION

Based on the foregoing, counsel asks this Court to impose a combined sentence of 30 years' imprisonment plus post-release supervision as such a sentence is sufficient, but not greater than necessary, to satisfy the remaining federal interests involved in this case. Stephen has continued family support despite the nature of his crime.[10] We further ask that that this Court

---

[10] See support letters from family submitted under separate cover.

13

recommend that Stephen be placed in a facility close to his family in Iowa and placed within a facility that has a sex offender treatment program.


DATED:	November 24, 2015				LISA A. PEEBLES
							Federal Public Defender

							By:  */s/Randi J. Bianco, Esq.*
							Assistant Federal Public Defender
							Bar Roll No. 507514
							Clinton Exchange, 3rd Floor
							4 Clinton Street
							Syracuse, New York   13202
							(315) 701-0080

TO:	Lisa Fletcher, Esq., AUSA
	Janna Kulakowski, USPO
	Stephen Howells