# FOOTNOTE 1

## Howells, Stephen M.█████████

Office/Outpatient Visit
**Visit Date:** Thu, Sep 5, 2013 01:27 pm
**Provider:** Gregory Healey, MD (Supervisor: Gregory Healey, MD; Assistant: Kristin Backus, LPN)
**Location:** Gregory Healey, MD

Electronically signed by Gregory Healey, MD on  09/08/2013 08:12:43 PM
Printed on 10/22/2014 at 9:46 am

## SUBJECTIVE:

**CC:**
Mr. Howells is a 38 year old White male.  He presents with insomnia.

**HPI:**

Insomnia noted.  This has been noted for the past 2 months.  Sleep has been disrupted by frequent awakenings.  On average, he estimates that he gets 6 hours of sleep per night.  Associated symptoms include anxiety.  He is improving and feels able to return to work next week.

**ROS:**
CONSTITUTIONAL:  Negative for chills, fatigue, fever, and weight change.
E/N/T:  Negative
RESPIRATORY:  Negative
MUSCULOSKELETAL:  Negative
PSYCHIATRIC:  See HPI

**PMH/FMH/SH:**
**Past Medical History:**

Hyperlipidemia: Hypercholesterolemia;
Asthma: mild severity; with infections usually;

**Family History:**
Father:
Positive for Hyperlipidemia,
Mother: Healthy

**Tobacco/Alcohol/Supplements:**
... Last Reviewed on 9/21/2012 11:32:57 AM by Healey, Gregory J
Tobacco: He has never smoked.

Alcohol:
Drinks alcohol on a social basis only ( 1-2 drinks per week on average ).


**Current Problems:**
Acute upper respiratory infection
Asthma
Hypercholesterolemia
Mixed hyperlipidemia
Perianal itch
Situational stress with anxiety

**Immunizations:**
None

**Allergies:**
 Last Reviewed on 9/21/2012 11:32:49 AM by Healey, Gregory J
 No Known Drug Allergies.

**Current Medications:**
Atorvastatin Calcium 10mg Tablet 1 TAB DAILY
Cialis 5mg Tablet Take 1 tablet by mouth daily.

10/22/2014 11:08 AM   FROM: (315) 379-9604 Gregory Healey, MD   TO: +1 (315) 701-0091   PAGE: 016 OF 057

Lotrisone 0.05%/1% Cream Apply small amount to affected area bid
Advair Diskus 500mcg/50mcg per 1blister Inhalation Powder Inhale 1 puff(s) bid
Albuterol HFA 90mcg/1actuation Oral Inhaler Inhale 1 to 2 puff(s) by mouth q 4 to 6 hr prn

## OBJECTIVE:

**Exams:**

GENERAL: well developed, well nourished, in no apparent distress
MUSCULOSKELETAL: normal gait; normal overall tone
PSYCHIATRIC: Orientation: alert and oriented x 3; ;  Mood/Affect: appropriate demeanor;,  Speech Pattern: normal;;
Thought Processes: normal rate and content of thoughts; good abstract reasoning;;  Abnormal Thoughts: no
hallucinations, delusions, obsessions, or suicidal/homicidal ideation; Insight/Judgment: good insight; good judgment;

## ASSESSMENT:

307.41     Insomnia
300.09     Situational stress with anxiety

## ORDERS:

**Other Orders:**
    Patient encounter documented using a qualified (non-CCHIT) certified EHR  (In-House)

## PLAN:

**Situational stress with anxiety**

RECOMMENDATIONS given include: return to work mext week.  Patient encounter documented using a qualified (non-
CCHIT) certified EHR

**Orders:**
    Patient encounter documented using a qualified (non-CCHIT) certified EHR  (In-House)

CPT ® is a copyrighted trademark of the American Medical Association

## Howells, Stephen M. ▓▓▓▓▓
Office/Outpatient Visit
**Visit Date:** Wed, Aug 28, 2013 08:22 pm
**Provider:** Gregory Healey, MD (Supervisor: Gregory Healey, MD;  Assistant: Melissa McIntosh, LPN)
**Location:** Gregory Healey, MD

Electronically signed by Gregory Healey, MD on  08/31/2013 04.20.53 PM
 Printed on 10/22/2014 at 9:46 am.

## SUBJECTIVE:

### CC:
Mr. Howells is a 38 year old White male.  He presents with cold symptoms and insomnia.

### HPI:

Patient to be evaluated for insomnia.  This has been noted for the past 2 months.  Sleep has been disrupted by frequent awakenings.  On average, he estimates that he gets 6 hours of sleep per night.  Associated symptoms include anxiety.


Acute upper respiratory infection details; these have been present for the past 4 days.  The symptoms include **productive cough and nasal congestion.**  He denies fever.  He has already tried to relieve the symptoms with acetaminophen, O.T.C. cough medication, and ibuprofen.

### ROS:
CONSTITUTIONAL:  Negative for chills, fatigue, fever, and weight change.
EYES:  Negative for blurred vision, eye pain, and photophobia.
E/N/T:  See HPI
CARDIOVASCULAR:  Negative for chest pain, palpitations, tachycardia, orthopnea, and edema.
RESPIRATORY:  See HPI
GASTROINTESTINAL:  Negative for abdominal pain, heartburn, constipation, diarrhea, and stool changes.
GENITOURINARY:  Negative for dysuria, genital lesions, hematuria, impotence, polyuria, and changes in urine stream.
MUSCULOSKELETAL:  Negative for arthralgias, back pain, and myalgias.
INTEGUMENTARY:  Negative for atypical moles, dry skin, pruritis, and rashes.
NEUROLOGICAL:  Negative for dizziness, headaches, paresthesias, and weakness.
HEMATOLOGIC/LYMPHATIC:  Negative for easy bruising, bleeding, and lymphadenopathy.
ENDOCRINE:  Negative for hair loss, heat/cold intolerance, polydipsia, and polyphagia.
ALLERGIC/IMMUNOLOGIC:  Negative for allergies, frequent illnesses, HIV exposure, and urticaria.
PSYCHIATRIC:  See HPI

### PMH/FMH/SH:
**Past Medical History:**

Hyperlipidemia: Hypercholesterolemia;
Asthma: mild severity; with infections usually;

**Family History:**
Father:
Positive for Hyperlipidemia;
Mother: Healthy

**Tobacco/Alcohol/Supplements:**
... Last Reviewed on 9/21/2012 11:32:57 AM by Healey, Gregory J
Tobacco: He has never smoked.

Alcohol:
Drinks alcohol on a social basis only ( 1-2 drinks per week on average ).


**Current Problems:**
Asthma
Hypercholesterolemia
Mixed hyperlipidemia
Perianal itch

**Immunizations:**
None

**Allergies:**
Last Reviewed on 9/21/2012 11:32:49 AM by Healey, Gregory J
No Known Drug Allergies.

**Current Medications:**
Cialis 5mg Tablet Take 1 tablet by mouth daily.
Vytorin 10mg/40mg Tablet Take 1 tablet(s) by mouth daily in the evening.
Lotrisone 0.05%/1% Cream Apply small amount to affected area bid
Advair Diskus 500mcg/50mcg per 1blister Inhalation Powder Inhale 1 puff(s) bid
Albuterol HFA 90mcg/1actuation Oral Inhaler Inhale 1 to 2 puff(s) by mouth q 4 to 6 hr prn

# OBJECTIVE:

**Vitals:**

**Current:** 8/28/2013 6.23:21 PM
Ht: 5 ft, 10 in;  Wt: 224 lbs;  BMI: 32.1
BP: 112/72 mm Hg (left arm, sitting);  P: 91 bpm (finger clip, sitting)
O2 Sat: 98 % (room air)

**Exams:**

GENERAL: well developed, well nourished, in no apparent distress
EYES: lids and conjunctiva are normal; pupils and irises are normal;
E/N/T: normal external ears and nose;;  normal external auditory canals and tympanic membranes; Nasal
Septum/Mucosa: **partially obscured by clear drainage; edematous mucosa;** Lips, Teeth and Gums:  normal;
Oropharynx:  normal mucosa, palate, and posterior pharynx;
NECK: Neck is supple with full range of motion; thyroid is normal to palpation;
RESPIRATORY: normal respiratory rate and pattern with no distress; percussion is normal without hyperresonance or
dullness; lung fields normal to palpation; normal breath sounds with no rales, rhonchi, wheezes or rubs;
MUSCULOSKELETAL: normal gait;
SKIN: no ulcerations, lesions or rashes
PSYCHIATRIC: mental status: alert and oriented x 3; Mood/Affect **anxious,** appropriate;  recent and remote memory are
intact; good insight and judgement;

# ASSESSMENT:

300.09    Situational stress with anxiety
465.8    Acute upper respiratory infection

# ORDERS:

**Other Orders:**
Patient encounter documented using a qualified (non-CCHIT) certified EHR  (In-House)

# PLAN:

**Situational stress with anxiety**

RECOMMENDATIONS given include: take a few days off and work some htings out.
FOLLOW-UP: Advised to call if there is no improvement in 2 week(s).  Patient encounter documented using a qualified
(non-CCHIT) certified EHR

**Orders:**
Patient encounter documented using a qualified (non-CCHIT) certified EHR  (In-House)

10 44 54 a m 10-22-2014 | 21 | (315) 379-9604

10/22/2014 11:08 AM  FROM: (315) 379-9604 Gregory Healey, MD  TO: +1 (315) 701-0081  PAGE: 021 OF 057

**Acute upper respiratory infection**

RECOMMENDATIONS given include: rest, increase oral fluid intake, and reduce fever with acetaminophen or ibuprofen. FOLLOW-UP: Instructed to call if he develops new or worsening symptoms, including chest pain, dyspnea, earache, and sputum production.

CPT ® is a registered trademark of the American Medical Association

# Erik N. Schlosser, Ph. D., ABPP

Licensed Psychologist
Diplomate of the American Board of Professional Psychology
Diplomate of the American Board of Forensic Psychology
Fellow of the American Academy of Forensic Psychology

Colonial Building    2 Fountain Street    Suite #205    Clinton, NY 13323-1725

Phone: (315) 853-8080    fax: (315) 853-8011    enschlosser@verizon.net

## PSYCHOSEXUAL EVALUATION

Client: Mr. Stephen Howells II
DOB: ▓▓▓▓▓▓
Case #: 5:14-cr-00340-GTS
Attorney: Ms. Randi Bianco
Dates of Evaluation: 11/25/14, 12/05/14, 12/12/14
Date of Report: 2/18/15

## REASON FOR REPORT

Ms. Randi Bianco, Assistant Federal Public Defender from the Federal Public Defender's Office in Syracuse, New York, contacted this evaluator on 10/07/14 on behalf of her client, Mr. Stephen Howells II. Mr. Howells is a 39 year-old (DOB = ▓▓▓▓▓▓ Caucasian male who was indicted on 09/17/14 and 10/08/14 by a grand jury in the United Stated District Court Northern District of New York. This evaluation was requested to provide information regarding Mr. Howells's past history, diagnostic clarification and future considerations.

## EVALUATION PROCEDURES

Evaluation of Mr. Howells took place on 11/25/14, 12/05/14, and 12/12/14 at the Cayuga County jail located in Auburn, New York. The evaluation lasted approximately 15 hours and consisted of psychological testing and clinical interviews. No attorneys were present during the interviews.

The following materials were reviewed for this evaluation:

(1) Discovery released by Federal government on 11/05/14 totaling 189 pages including investigation reports, warrants, inventories, St. Lawrence Sheriff's Office documents including voluntary statements from Mr. Howells and Ms. Vaisey, and criminal history search;
(2) *Indictment,* Criminal 5:14-cr-00340-GTS dated 09/17/14;
(3) *Superseding Indictment* 5:14-cr-00340-GTS dated 10/08/14;
(4) SUNY Canton records;
(5) Hermon-Dekalb Central School District records;
(6) Colton-Pierrepont Central School records;
(7) Roberts Wesleyan College records;
(8) Clinton County Sheriff's Office Police Accident Report dated 04/12/07;

Psychosexual Evaluation     Stephen Howells II     DOB: ▮▮▮▮▮     Report Date: 02/18/15

(9) VESID Adult Career & Continuing Education Services records;
(10) Medical records from Claxton Hepburn Medical Center, Edward John Noble Hospital, and Gouverneur Hospital; patient records from Dr. Gregory Healey.

The following collateral interviews were conducted by telephone:

(1) Mr. Stephen Howells Sr., Mr. Howells's father, on 12/11/14 for approximately 43 minutes;
(2) Ms. Vera Carpenter, mother of Mr. Howells, on 12/11/14 for approximately one hour and 41 minutes;
(3) Mr. James Howells, brother of Mr. Howells, on 12/11/14 for approximately 25 minutes.
(4) Ms. Mary Ann Howells, Mr. Howells former spouse, on 02/01/15 for approximately 5 minutes.

The following tests were administered to Mr. Howells as part of the evaluation:

1. Multiphasic Sex Inventory II (MSI-II)
2. Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
3. Trauma Symptom Inventory-2 (TSI-2)
4. Substance Abuse Subtle Screening Inventory-Third Edition (SASSI-3)
5. Structured Interview of Reported Symptoms (SIRS)
6. Personality Assessment Inventory (PAI)

Mr. Howells was given a document entitled *Apprisal of Rights* at the beginning of the evaluation on 11/25/14 which explained the limits of confidentiality and the purpose and conditions of the evaluation. It was reviewed and questions were answered.  Mr. Howells expressed his understanding verbally and in writing and he agreed to participate in the evaluation.

## CHARGES

Mr. Howells is currently charged with Conspiracy to Sexually Exploit Children (1 count), Sexual Exploitation of Children (15 counts) and Possession of Child Pornography (5 counts) which reportedly occurred between September 2013 and August 15, 2014. Counts involve six identified victims: 12 year-old female (Victim 1), 7 year-old female (Victim 2), 7 year-old female (Victim 3), 8 year-old female (Victim 4), 5 year-old female (Victim 5) and a 10 year-old female (Victim 6).

Count 1 (Conspiracy to Sexually Exploit Children) involves victims 1, 2, 3 and 6 between September 2013 and August 15, 2014.

Counts 2 through 10 (Sexual Exploitation of Children) involve the following (taken from the *Superseding Indictment)*:

Psychosexual Evaluation      Stephen Howells II      DOB: ▮▮▮▮▮      Report Date: 02/18/15

| Count | Date | Victim |
|---|---|---|
| 2 | September 7, 2013 | V-3, a female child born in 2006 |
| 3 | October 20, 2013 | V-3, a female child born in 2006 |
| 4 | November 16, 2013 | V-3, a female child born in 2006 |
| 5 | November 17, 2013 | V-6, a female child born in 2003 |
| 6 | December 15, 2013 | V-6, a female child born in 2003 |
| 7 | December 29, 2013 | V-3, a female child born in 2006 |
| 8 | April 18, 2014 | V-3, a female child born in 2006 |
| 9 | May 31, 2014 | V-3, a female child born in 2006 |
| 10 | August 13, 2014 | V-1, a female child born in 2002 |

Counts 11 through 16 (Sexual Exploitation of Children) involve the following (taken from the *Superseding Indictment)*:

| Count | Date | Victim(s) |
|---|---|---|
| 11 | December 16, 2012 | V-4, a female child born in 2004 |
| 12 | September 22, 2013 | V-3, a female child born in 2006; V-5, a female child born in 2008; and V-6, a female child born in 2003 |
| 13 | November 16, 2013 | V-5, a female child born in 2008 |
| 14 | December 13, 2013 | V-5, a female child born in 2008; and V-6, a female child born in 2003 |
| 15 | January 24, 2014 | V-3, a female child born in 2006 |
| 16 | April 19, 2014 | V-3, a female child born in 2006 |

Counts 17 through 21 (Possession of Child Pornography) involve possession of images of prepubescent children and children who had not attained the age of 12 on or about August 15, 2014.

All counts involved actions that occurred in St. Lawrence County, New York.

The following information was noted in the discovery materials:

      8.    Vaisey and Howells each provided voluntary statements at the St. Lawrence County Sheriff's Office (SLCSO) in Canton, New York. The interview of Vaisey, which resulted in a six page statement, was conducted by a SLCSO Detective Sergeant and a FBI Special Agent. The interview of Howells, which resulted in a 8 page statement, was conducted by a SLCSO Detective Sergeant. In summary, Vaisey and Howells admitted the following:

      a.    On Wednesday, August 13th, 2014, Vaisey and Howells kidnapped two young Amish females, ages 6 and 12, from a roadside farm stand on Highway 812 between

DeKalb and Heuvelton in St. Lawrence County. A scheme to kidnap children had been discussed and planned by Vaisey and Howells for several months before the abduction. Vaisey and Howells drove to the location of the kidnapping in Howells' white four door vehicle. Vaisey was the driver. After Howells forced the victims into the back seat of the vehicle he used a syringe to inject a drug into the older female victim in an attempt to get her to keep quiet. Howells admitted that he injected the older victim with Versed.[1]

      b.    After arriving back at their residence (the location of the August 15th search warrant), Howells bathed and sexually assaulted the victims several times over the course of approximately 25 hours. To facilitate the sexual abuse, which included anal, vaginal, and oral penetration, as well as fondling, Howells admitted that he administered Ambien[2] to the children. When not being abused, the victims were restrained together at the ankles with handcuffs and chains. The sex acts were recorded by use of a camera, webcam, and a laptop computer.

      c.    During the evening of August 14th, Howells and Vaisey decided to release the victims in a rural area of Hermon, New York. As planned by Vaisey and Howells, Vaisey traveled ahead of Howells on a predetermined route to ascertain the presence of law enforcement. Text messages were exchanged between Howells and Vaisey that contained code words designed to indicate whether the route was clear. When Vaisey texted to Howells the pre-determined code indicating that the route was clear Howells drove the children to a remote location and released them into a wooded area. (Mobile iPhones belonging to Vaisey and Howells were recovered. Vaisey is the subscriber of mobile telephone number (315) 854-1422 and Howells is the subscriber of mobile telephone number (315) 854-7783. Howells' phone (iPhone model #A1349, EMC#2422, FCC ID: BCG-E2422B) was located in the residence as a part of the search warrant, and Vaisey voluntarily turned hers over to law enforcement. Howells' phone is password protected and locked. Apple has the ability to unlock the phone with an Order from this Court allowing them to assist law enforcement in this way. Vaisey gave her password to law enforcement to enable them to access her phone. Based upon my training and experience, I know that communications between Apple devices may be sent via Apple servers without involving the mobile service provider. This is known as iMessage.)

Psychosexual Evaluation      Stephen Howells II      DOB: ████      Report Date: 02/18/15

d.      Vaisey stated that after they released the children Howells ~~hid~~ the pictures of them on his computer.

e.      Howells and Vaisey also advised that there are additional victims (minor females) that have been sexually abused by Howells in a similar manner, and that said abuse was also videotaped.  Vaisey stated that Howells administered Ambien to one of the additional victims.  Howells admitted that he administered Ambien to an additional victim, but not the same victim named by Vaisey.  Howells also said he used Benadryl with the additional victims.  He also admitted stealing Versed several months ago from the hospital where he is employed.

f.      Vaisey advised law enforcement that she had entered into a "contract" with Howells by which she was his "slave," meaning "you can do whatever you want to that person."  (During the course of the search warrant execution a contract signed by Vaisey was located, as were two similar contracts signed by other individuals.)

## RELEVANT BACKGROUND HISTORY
### (based on interviews and records)

Developmental History
Mr. Howells is the oldest of four sons (Stephen, Carl, Elon and James) born to his biological parents in Saranac Lake, New York. No problems with prenatal health were reported. Significant problems with developmental milestones were denied.

His parents separated and divorced when he was between the ages of 5 and 6. Mr. Howell stated that his earliest memories were "my father yelling and being violent with my mother, breaking my fish tank" and his brother James also spoke about his father's abuse of his mother. Mr. Howells' mother (hereafter referred to as Vera) also reported that her relationship with Mr. Howells' father (hereafter referred to as Stephen Sr.) was marked by verbal and physical abuse. Vera stated that Stephen Sr. would "smash up the house, he would kick me all the time, throw things. I would be getting dinner ready; he would start screaming, yelling 'clear the kitchen table', throw pots at the wall, then sit in the chair as if nothing had happened." She denied that Mr. Howell was physically abused by his father, stating that she had intervened one time and "he never tried it again." She stated that Stephen Sr. would return to their home on occasion after the divorce in order to have sex with her despite having left the family in part due to his desire to live out his same-sex sexual orientation. She stated that it was a control issue in that he would force her to have sex with him; she stated that Stephen Sr. would tell her that she could have sex with him or he would engage in sexual behavior with one of the boys. She stated that while engaging in sexual intercourse with her Stephen Sr. would discontinue if she was expressing pleasure and would continue sexual activity if she expressed pain or discomfort. She stated that her son Elon was born early because Stephen Sr., who had fathered the child, had engaged in

Page 5 of 19

violent sexual intercourse with her: "I was 8-9 months pregnant, very pregnant, he said to get ready, he laid on me heavily, I would poke him in the ribs, said he was hurting me, he'd press harder…he'd usually take about four and a half minutes but if it hurt he'd go longer, about 30 minutes…four hours later my water broke." She stated that Stephen Sr. would stop having sex with her once she would become pregnant "unless he was mad". She described her ex-husband as "unpredictable" and a "monster".

She also reported that Stephen Sr. would hold a milk bottle in a suggestive position on his groin when feeding Mr. Howells as a child and that he had Mr. Howells perform oral sex on him when he was an infant. She stated that Stephen Sr. had admitted this to her several months before he left the family. Vera also stated that Stephen Sr. would take an inordinate amount of time manipulating Mr. Howells penis when changing his diaper, "I thought he was being thorough but realized he was deriving pleasure from it."

Stephen Sr. denied any history of abusing any of his family although he admitted some verbal abuse with Vera. He stated that his children had been "brain-washed" against him after the divorce. He did state that all of his children had seemed highly sexualized in their vocabulary and behavior while growing up as indicated by their talking about sex at an early age and one of his children (not Mr. Howells) "running around naked and pressing his genitals against my hand." He stated that Vera's parents were highly sexualized and would fill the Howells children's minds with sexual talk. Stephen Sr. also suggested that some of the men that lived with Vera and the children may have been sexual with the children. He stated that he had been accused by his ex-wife and her family of sexually abusing his children which child protective services had reportedly investigated with no negative findings. Vera stated that CPS did find "inappropriate touching" but "not enough to press charges".

Mr. Howells and his brother stated to this evaluator that they had talked with each other about the sexual abuse allegations against Stephen Sr. and had concluded that they had no memories of any abuse including time spent in the summer with their father in Colorado in their early teens. They also stated that they believed they had fewer memories of their childhood than most other people.

After the divorce Vera and her children moved several times within St. Lawrence County, often to where a current boyfriend of Vera's was living. Some of the places did not have running water or indoor plumbing and the family struggled financially. All parties interviewed for this report indicated that Mr. Howell grew up in situations that were considered neglectful. Mr. Howells lived in Hermon, Dekalb, Canton, Potsdam, Colton, and Parishville, changing residences within each place depending on the financial and social circumstances at the time. Mr. Howells lived with his Aunt Carol on his mother's side on two occasions: from ages 9-11 and again from ages 13-15. On one of these occasions he was placed with his aunt as a foster care placement after being removed from his mother's home due to neglect. During his second stay with his aunt, Mr. Howells' cousin, the son of his aunt, killed himself with a gun after a previous attempt with pills two weeks prior was not successful. Mr. Howells did not witness the event. Vera corroborated the suicide event.

Page 6 of 19

Psychosexual Evaluation     Stephen Howells II     DOB: ███████     Report Date: 02/18/15

Mr. Howell would attend school at times in dirty clothing including clothes soaked in urine. This occurred due to a sibling who had enuresis and whose clothes and bedding would come in contact with Mr. Howells' clothing. The family did not own a washing machine or much in the way of children's clothing so Mr. Howell would wear his soiled clothes to school. Colton-Pierrepont Central School records included a health report on Mr. Howell dated 11/16/88 that included the following:

> These boys appear to be in good physical health. However, due to poor personal hygiene they are encountering some problems. Their body odor, particularly of urine, is causing them some difficulties with their peers...This week on two days the boys arrived in such a dirty condition that we provided them with showers and clean clothing.

The following letter was written by Stephen Sr. to the Colton-Pierrepont Central School District on 01/31/89:

> I had a telephone conference yesterday with my attorney, David Garner, and he suggested that I write you again. I have not heard from any of my boys since October and I'm very concerned about how they are faring the winter with living conditions, health and school.
>
> My mother lives in Brushton and last saw the boys in October. She normally has them for the week after Christmas, and this year, since they did not have a phone, she had written their mother, Vera, about the usual visit and to inquire if Vera was bringing them to Brushton or if she should come get them. She received no reply and still has not heard anything from them. In the past, Vera has had a tendency to avoid all family (hers and mine), when there are problems at home, so my mother is also very concerned. She is afraid to try and go back into the woods alone where they live during the winter.
>
> I had sent toys, winter shirts, thermal underwear and socks at Christmas and don't even know for sure if they got them. I had sent checks for school grades and the children did endorse those. Other than that, we don't even know if the children are still in your school district, as Vera has moved from school to school in the past.
>
> Mr. Garner suggested that I ask you if the school nurse could make a home visit. The school nurse at Edwards-Knox in Russell made a home visit the first time they were in that school and found conditions at home deplorable. The school notified Social Services and the caseworker went in and did some parenting and work with Vera.
>
> Social Services did make a home visit last fall to where my boys live now and wrote me that living conditions were adequate, but "minimal". To my knowledge, they have not been back since. They did not indicate that a man was living in the home. Also, Family Intake Services had an appointment with Vera about having the boys keep in touch with me. They wrote me that they were unable to get much cooperation or commitment from her, as her reply was that she would not "force" the boys to call me if they did not wish to. They suggested I should contact my attorney and possibly Family Court. I promised my boys last summer that I would not go back to court unless I had to, as they still had the fear I was trying to take them away from their mother and they would never see her again. This has never been my intention, even though I find it difficult to accept her lifestyle.

Page 7 of 19

Psychosexual Evaluation     Stephen Howells II     DOB: ███████     Report Date: 02/18/15

Mr. Howell went to live with a female teacher and her husband around the age of 15 after living with his maternal aunt for the second time. According to Vera, "My sister was mean to my kids. One of his teachers volunteered to have him move in with her and her husband". They owned a farm and he spent time working there and attending classes. He eventually took the GED test to graduate early in order to attend college.

Mr. Howells was raised as a Southern Baptist and he described himself as very religious growing up. One of the reasons he married so young was to be able to have sex without guilt. He stated that his religious views changed with time and he began to doubt his faith. He stated that he has prayed since his arrest and feels that God exists. He also stated that he was influenced by certain eastern philosophies (Zen, Bushido) while doing martial arts that emphasized self-sufficiency, being a producer in society, and doing the "honorable thing" if humiliated in order to regain your honor.

Educational History
Mr. Howells was held back in pre-kindergarten and in 4th grade due to problems with reading and spelling. He also changed schools several times due to his family moving. Vera stated that she had Mr. Howells change districts one time when he was bullied on the school bus in one district. She also stated that he had been designated to attend special education classes due to his spelling problems even though he was in an advanced science class at the time and was not a behavioral problem in school. No history of suspensions or expulsions was noted. Grades varied from below average to above average depending on the subject.

He left school before the 12th grade to obtain a GED from Parishville-Hopkinton High School and to enroll in college as an early admission in 1994. He attended SUNY Canton College of Technology, Roberts Wesleyan College and Potsdam College before receiving his associate's degree in nursing from SUNY Canton in 2004 after completing his military service. Grades were above average. He was referred to Adult Career and Continuing Education Services-Vocational Rehabilitation (ACCES-VR) at SUNY Canton for assistance due to his learning disability in spelling. A psychological assessment was completed at that time but was not found in records. A note in his ACCESS-VR records dated 01/03/03 indicated that "*His academic achievement skills are significantly lower than intellectual abilities and he is particularly weak in spelling. He also showed weaknesses in intermediate auditory memory and short-term memory as well as verbal memory.*" He was determined to be eligible for services and was provided computer programs to assist with spelling.

Medical History
Mr. Howells has been diagnosed with hyperlipidemia, hypercholesterolemia, asthma, heart palpitations, chlamydia, genital warts, and GERD. He is not currently taking any medication. Past surgical history includes an appendectomy in 1985 and a vasectomy in 2009. No history of head injury was reported or found in records. ACCES-VR records indicated a "10% shoulder loss" but no information was available regarding the cause or length of time he had experienced that problem. A leg injury requiring an ER visit on 03/11/87 was noted but neither Mr. Howells nor his family could recall the circumstances of the incident.

Psychosexual Evaluation    Stephen Howells II    DOB: ███████    Report Date: 02/18/15

## Substance Abuse History

No history of substance abuse or loss of work or school due to substance use was reported or found in records. He reported three episodes of blackouts due to alcohol, twice while in the military and once with a brother as an adult. Mr. Howells stated that he first drank alcohol on a regular basis in his 20's. He denied any use of drugs or abuse of prescription drugs. He acknowledged obtaining drugs through theft or fraud (reporting symptoms he did not have) for use in rendering victims unconscious or unable to recall events.

## Employment History

Mr. Howells appears to have maintained some form of employment on a regular basis since elementary school according to self-report, his parents and available records. As a child he did yard work and beekeeping when staying with his maternal grandparents. In high school he continued with beekeeping while also participating in an after school work program sponsored by the Job Training Partnership Act. He also worked on a farm after moving out of his family home at age 15 while living with the couple who ran the farm. Other jobs prior to his military experience and nursing career included a cashier, merchandise stocker, laborer, and housekeeper.

Longest job held was in nursing at CHMC for approximately six years with another three to four years of work in a nursing capacity noted (CNA, medical assistant, and registered nurse). Mr. Howells was accused of sexual harassment at work about four years ago and had to undergo training as a result. He stated that he had made sexual innuendos to a female co-worker whom he thought enjoyed the experience but who eventually made a complaint against him.

He also served as a medic in the Air force for five years starting in 1996. He was reportedly honorably discharged from the service and reported one episode of disciplinary problems when he received an Article 15 hearing after going to Mexico from Texas for three days with three female service members without permission. He was fined $100 as a result.

He stated that his worst job was being a nurse because he "hated working for others". He admitted feeling irritated at times when patients from lower socioeconomic situations presented to him. He also reported feeling "burnt out" as a nurse on two occasions.

## Social History

Mr. Howells reported having some social activity at school while growing up but was hampered by a lack of transportation given that most of the places in which he lived were far away from neighborhoods and most of the time his family vehicles were unreliable. He described himself as a "loner" who was ostracized due to issues with cleanliness. He stated that he focused on making money in order to buy things like books or cassette tapes. He stated that he did not have new clothes from a department store until high school.

In high school he played soccer and participated in martial arts. Most of his friends were girls whom he described as "other misfits". Mr. Howells considered himself "ugly and painfully shy" with a sarcastic attitude while growing up but stated that he became aware of his intelligence, positive personality features and "reasonably handsome" looks when he became an adult. His mother described him as a kind person who was always helpful to her. Mr. Howells stated that he used to "manipulate" his mother into spending money for pizza or others things even though they

Page 9 of 19

Psychosexual Evaluation     Stephen Howells II     DOB: ████████     Report Date: 02/18/15

didn't have any extra money. He also stated that his mother would tell him that he was a natural salesperson and could "sell sand to a Saudi". Mr. Howells stated that his father was very short-tempered and appeared to hate women, reportedly referring to women as "bitches" and "whores".

Mr. Howells was married twice. His first marriage to Adrienne in 1992 occurred when he was 19 and she was 18. It was his first dating relationship which started in high school. They were married for about a year before Mr. Howells ended the marriage due to his "wanting more women". His second marriage, to Mary Ann, took place in 2001 and ended in 2012. He was 26 at the start of the marriage and she was 30. They had three children: Alexandra (current age 12), Michel (age 8) and Daniel (age 6). Mr. Howells indicated that he ended the marriage because he "fell out of love, [she] did not let me act out my needs." See *Sexual History* section below for additional details.

Mental Health History

Vera reported that she has a long history of depression for which she takes medication and receives disability benefits. She also reported that she had Mr. Howells and his siblings seeing therapists on occasion in the context of the separation, divorce, and accusations of sexual abuse. She denied any history of psychotropic use or diagnoses for Mr. Howells while he was growing up. Stephen Sr. stated that he was involved in counseling at this time in the aftermath of his partner's recent death.

Mr. Howells reported being depressed for about six months in 2013 in the context of job dissatisfaction and missing his family. He reported consulting with a doctor who wrote a note to his employer stating that he needed to take some time off. After two weeks he requested an additional two weeks away from work which reportedly was granted. He then changed jobs and reportedly experienced decreased negative moods as a result. He also reported anxiety attacks and depressed mood when first arrested for the instant offense with his last panic attack occurring about two months ago. He also reported one episode of suicidal behavior by trying to induce a heart attack by overexertion after he was incarcerated initially. Mr. Howells reported that he no longer wishes to end his life by his own hand (active suicidal thoughts) but occasionally feels like he would "not mind" passing away suddenly in order to not be a burden to others (passive suicidal thoughts). Part of his thinking is due to his belief that one should be a "producer" in society and not a "burden" and the concern that he will be able to access appropriate treatment while incarcerated.

He has no history of ongoing mental health treatment, use of psychotropics or psychiatric hospitalizations. Mr. Howells did report attending couples counseling for a brief period during his first marriage. He acknowledged that his attempt to obtain medication for mood or sleep problems in the past was to obtain medication for use on his victims. He denied any history of suicidal behavior prior to the instant offense.

Criminal History

This is Mr. Howells's first arrest. History of viewing child pornography, obtaining prescriptions in a fraudulent manner, and stealing medications from work were reported prior to the activities noted in his current charges. Family history of criminal activity was denied. He reported

Page **10** of 19

Psychosexual Evaluation      Stephen Howells II      DOB: ███████      Report Date: 02/18/15

shoplifting at age 10 (his mother reported it occurred when he was 5) but was not charged although his mother called the police and had Mr. Howells return the item to the store and admit his theft to the store owner.

<u>Sexual History</u>

Mr. Howells stated that he never saw his parents engage in any sexual behaviors. He indicated that his father was gay and had lived in a long-term relationship with another man in Colorado for many years. Mr. Howells stated that he used to be "homophobic" but came to accept his father's lifestyle over time.

Mr. Howells was uncertain if he was sexually abused as a child. As noted earlier, he was told that his father had abused him but Mr. Howells indicated no memories of the abuse. He also indicated uncertainty about an incident involving his cousin who killed himself in which the cousin allegedly went into the shower with Mr. Howells in order to help him bath. Mr. Howells stated that he was uncertain of his age at the time and if it happened more than once. His cousin was a few years older than Mr. Howells. Mr. Howells stated that he felt "embarrassed and confused" at the time and believes that his later fixation with touching his own anus to the point of causing pain may have been rooted in the experience with his older cousin. Mr. Howell stated that he never witnessed anyone being sexually molested when he was a child.

First masturbation reportedly occurred at age 5 with first ejaculation occurring around the age of 9 or 10. Mr. Howells stated that he remembered enjoying the experience despite religious prohibitions against such activity. First sexual feelings about females started at age 5. He reported seeing girls on the school bus when he was age 6 or 7 and would think of them being naked and touching them while masturbating on a nightly basis. He reported masturbating on a nightly basis. First sexual touching of a female occurred when he was age 6 or 7 when he grabbed the breast of his female babysitter who was age 16 or 17 at the time: "[We were] jumping on the bed, [I] remember grabbing [her] breast for my own sexual pleasure, she just laughed…"

When Mr. Howells was age 13 or 14 he had a girl from church age 6 or 7 sit on his lap during which he touched her leg and rubbed her panties with his hand. He also reported pressing up against females in pools or during other activities for sexual pleasure while growing up.

Mr. Howells reported having his first inappropriate sexual fantasies when he was around the age of 12. He would fantasize being on a photo shoot with a woman and a photographer, knocking out the photographer, and tying up the woman until she agreed to have sex. He estimated that 50% of his sexual fantasies by the age of 12 involved similar inappropriate scenarios and tended to involve girls who were mean to him. He reported trying to grab the breasts of female peers in PE class starting at age 12 and having fantasies about putting up cameras in the girls' locker room. He stated that his inappropriate thoughts and fantasies grew with time. Mr. Howells estimated that he engaged in sexual activity including masturbation, sexual fantasies and viewing pornography starting in middle school on a nightly basis.

First sexual intercourse took place when he was age 19 with his 18 year old girlfriend whom he married about six months later. They had dated since he was age 16. He described his first sexual

Psychosexual Evaluation     Stephen Howells II     DOB: ███████     Report Date: 02/18/15

intercourse as follows: "I tried to make it perfect, touching, kissing, laid her down, penetration. She felt she wanted to be more active, she felt I was directing the whole thing." They were married for about a year during which Mr. Howells' sexual fantasies went beyond what she was comfortable with (no oral or anal sex). He reported engaging in sexual activity with his first wife on a regular basis at first which decreased over time. He reported having inappropriate fantasies about 30% of time during the marriage.

Mr. Howells enlisted in the Air force about six months after his first marriage ended. He dated a few women in the service and started to go to strip bars. He had sex with some females whom he dated but nothing "unusual" until he was 22 or 23 when he met a woman who was his age and who stated that she liked sexual activity involving strangulation: "I tried it...freaked me out, worried I would mess up." After they dated a couple of months he met and began a relationship with Mary Anne who would become his second wife and the mother of his children. He stated that bondage and wrestling for sex took place during the first five years of their relationship but then stopped at her request. They separated in 2011 due to financial problems, what he described as her "condescending attitude", and his dissatisfaction with their sexual activities. Mary Anne confirmed to this evaluator that she had discovered child pornography on Mr. Howells computer during their marriage and he had set up his computer to delete all files if his password was attempted unsuccessfully.

During his marriage to Mary Anne, Mr. Howell engaged in sexual activities with a 15 year-old female cousin who babysat for him over the course of a year. He stated that she would babysit the children while he slept (he was working nights at the time). She told him that she had been attracted to him since she was little. He also reported engaging in sexual activities with an adult female in 2011 whom he would meet on weekends by telling his wife that he had to go on business trips or outings with friends. Starting in 2012 he became involved with women he met online using the "FetLife" website which caters to people with interest in BDSM (Bondage, Discipline, Sadomasochism). He would engage in BDSM sexual activities with women met through the website as well as a local BDSM club that meet in the Watertown area. He would spend a great deal of time viewing and collecting online pornography and he estimated that virtually all of his sexual fantasies around that time involved BDSM activities.

Mr. Howells reported first looking at pornography while in middle school. He stated that he found several magazines under his maternal grandfather's bed. He would look at a picture and fantasize about the female in it. He discovered online pornography in his early 20's and reported "hoarding" images. He started to fantasize about pubescent females starting around the age of 20 and reportedly began fantasizing about prepubescent females a few years ago. He stated that he attempted to obtain virtually every type of pornography available due to fear that images would become unavailable at some point. As he collected more and different types of pornography his sexual interests became more varied as well. He reported trying to stop watching pornography on two occasions:

> Once around the age of 25 I deleted my whole computer and tried to stay away from the CP [child pornography] for about 4-5 months before I fell back into it. The next time was around the age of 33-34, once again I fell back into it after a few months. I considered seeking professional help but even if I could find a counselor/psychiatrist I could trust,

Psychosexual Evaluation      Stephen Howells II      DOB: ███████      Report Date: 02/18/15

what about the staff, the biller, the records person, the transcriber, any one of them could talk, given my work [nursing] it would spread like wild fire through the region. It was not an option I could trust.

Mr. Howells reported becoming "bored" with internet porn at one point and started to spend time viewing websites with video cameras showing women engaging in live sexual activity. He would record sessions viewed online and download for viewing at a later time.

Mr. Howells reported having 20-30 sexual partners in his lifetime, all females. He denied any history of sexual activity with males and described himself as heterosexual. He stated that he had been too active sexually, that sexual thoughts and fantasies had become an obsession with him, and that he gave in to his fantasies in the instant offense.

He reported meeting Nichole, 14 years younger than him, and his accomplice in the instant offense, in 2012 on the "FetLife" website. He stated that she was "into" bondage, control, humiliation, and rape scenes. He told her to send him a photo to test her ability to submit which she did. They had sex when they first met, and he viewed her as compatible, "She had read a lot about submission and bondage and knew how to behave as a submissive." After a couple of months together he asked her to do some role playing as a young girl. During this time he was also seeing a woman named Amber who had three young daughters.

Mr. Howells had started to develop a fantasy of drugging a young girl and engaging in sexual activity with her a few years prior to meeting Nichole. He described how he planned his activities by having Amber's daughters stay with him and how he obtained medication to have them fall asleep or become so drowsy that they could not remember what had happened to them. He also described how he videotaped the children. He also talked about his relationship at that time with a woman named Melissa who had two daughters ages 12 and 6. He stated that he and Melissa engaged in BDSM activities and eventually he put himself in a position to have her leave her children at his home. Mr. Howells also reported taking underwear from the female children in order to use the items for masturbation and fantasy.

Mr. Howell explained how Nichole fit into his sexual activities at the time including the so-called "slave contract":

> I showed Nichole pictures of [a child victim], told her what I was doing. She was into it. I had made her do some proof to protect myself. [It] Also gave me protection if she wanted to turn on me. She said it awakened some urges that she had repressed.

> Initially it was a 'pet' agreement, [I] call her pet, to us it meant she was something I owned. It was common on the website...BDSM agreements...Had discussed sex slave stuff but not signed specific contract to my knowledge but agreed in principle she was my slave. You're my property. I can do with you as I want. Since I had discovered people who thought like me I had wanted someone to be my sex slave or property for me to be their master. This was probably 50/50. Half was sex slave but half was regular boyfriend-girlfriend stuff.

Page **13** of 19

Psychosexual Evaluation     Stephen Howells II     DOB: ████████     Report Date: 02/18/15

Mr. Howells reportedly began to experience fantasies involving kidnapping which he discussed with Nichole and starting planning out to the point that it became an obsession by the spring of 2014: "The Amish thing was a fluke, just presented itself, more available, see them walking by themselves. My impression—Amish didn't value female children as much, they would withhold treatment if it was expensive. Made it more justifiable." He reportedly started to steal items from grocery stores to test his nerve. He set up three rules for the kidnapping: he had to have the room for holding the girl(s) completed; the person(s) had to live more than 20 miles from his place; and the girl(s) could not have had any interaction with him or his family at work. He admitted straying from the rules in his haste to commit the offense. He described his fantasy and the reality of the episode as follows:

> They would be sad at first but adapt, I would provide environment, they would learn to enjoy sexual activity, I wouldn't feel the guilt I actually felt…All the stories I read, all the fantasies I developed…Reality was I felt badly. They said they wanted to go home, go to church. I realized if I let them go I'd probably get caught. Went much bigger on the news than I anticipated…We [he and Nichole] both felt guilty, realized it wouldn't work. [The] room wouldn't be effective. We're gonna get caught. If we let them go, we'll get caught. We can't keep them, we can't harm them, harming was a quick discussion but we didn't want to feel more guilty.

Mr. Howell described the instant offense consistent with his confession. Mr. Howells denied engaging in any sexual activity with his own children stating that he would admit it if he did but "I'm just not wired that way [to have sex with his own children]". He reported current masturbation frequency of once a night with fantasies involving sexual experiences with Nichole that do not include children.

## EVALUATION

### Behavioral Observations

Mr. Howells presented with inmate apparel and displayed appropriate hygiene and grooming. He looked his chronological age. No distinguishing marks or features were noted. No psychomotor abnormalities were noted. No impairment in cognitive functioning was noted. He denied any current problems with sleep, appetite or energy level. Mr. Howells described his current mood as "okay". He appeared oriented to time, place and person. He reported a past history of suicidal thoughts when first arrested but stated that he no longer has such thoughts and does not wish to die at this time. He denied any hallucinations. He was cooperative, answered all questions, and his self-report corroborated with official records in terms of the instant offense.

Mr. Howells was tearful at times when speaking about his sexual problems, expressed a desire for treatment, and concern that treatment would be available to him. He demonstrated some insight by describing some of his thinking as "wrong" in terms of his criminal activity, for example, the idea that he would select victims who faced almost certain negative futures because it would be "doing them a favor". Surprisingly, he did not attribute his sexual problems to any particular circumstance or person; instead, he described himself as having significant problems for a long time and was unable to implement his fantasies due to his rush to implement his plan before it was ready and the guilt and shame he felt which "surprised" him.

Page 14 of 19

Psychosexual Evaluation     Stephen Howells II     DOB: ▮▮▮▮▮     Report Date: 02/18/15

Psychological Testing
The Substance Abuse Subtle Screening Inventory III (SASSI-3) is a screening assessment tool
for substance use disorders that includes validity scales to measure one's test-taking approach.
The SASSI-3 was administered on 11/25/14. Mr. Howell's test profile, which was considered
valid, is associated with a low probability of having a substance dependence disorder.

The Personality Assessment Inventory (PAI) is a test used in the clinical assessment of adults. It
is designed to provide information regarding clinical diagnoses, treatment planning, and general
psychopathology (it does not address sexual problems). It includes scales that gauge the validity
of the test taker's approach to the test. Mr. Howells was administered the test on 11/25/14.

Some inconsistency was noted in item response analysis but not to a degree that would render the
test results invalid. People with similar profiles tend to endorse a greater use of drugs or alcohol
than Mr. Howells but overall results indicated that he did not appear to resort to either a positive
or negative impression management style in approaching the test. His clinical profile indicated
moderate difficulty related to current stressors and life circumstances. While he tends to view
himself as active, outgoing, ambitious and self-confident, others may view him as impatient and
somewhat demanding. He reports a personality style that includes a degree of adventurousness,
risk-taking and a tendency to be impulsive. He may be viewed as pragmatic and unsympathetic
in his relationships. He describes himself as moody and dissatisfied with his more important
relationships and may be viewed by others as overly sensitive. Self-concept includes alternating
between self-confidence and self-satisfaction and pessimism and self-doubt. He reports that
supportive relationships help serve as a buffer to stress.

Mr. Howells denied any significant problems with unusual thoughts or peculiar experiences,
undue suspiciousness or hostility, unhappiness or depression, marked anxiety, problematic
behaviors used to manage anxiety, or difficulties with health or physical functioning. He also
reported no significant problems with drugs or alcohol. He acknowledged suicidal thoughts in
the context or his current predicament.

In terms of treatment, Mr. Howells' test profile is consistent with one who acknowledges
important problems and the perception of a need for help in dealing with these problems. He
reports a positive attitude towards the possibility of personal change, the value of therapy, and
the importance of personal responsibility. He reports a number of other strengths that are positive
indications for a relatively smooth treatment process and a reasonably good prognosis.
Diagnostic possibilities associated with this profile include Adjustment Disorder and Personality
Disorder Not Otherwise Specified (NOS) including features of Borderline, Antisocial,
Narcissistic and Paranoid personality styles.

The Trauma Symptom Inventory-2 (TSI-2) is a test used to assess trauma-related symptoms and
behaviors. Mr. Howells completed the test on 12/05/14. Mr. Howells endorsed clinically
significant levels of the following: anxious arousal, over-activation of the sympathetic nervous
system, depressed mood and/or thoughts in which he sees himself as worthless, intrusive
experiences in which he remembers unpleasant memories, attempts to avoid overwhelming
psychological distress, acknowledgment of dysfunctional and maladaptive sexual behavior

Page 15 of 19

Psychosexual Evaluation      Stephen Howells II      DOB: ██████      Report Date: 02/18/15

experienced as impulsive or compulsive, suicidal thoughts and behaviors within the past six months, insecure attachments to others, and preoccupation or fears of the possibility of abandonment or rejection by others. People with similar profiles tend to endorse some or many symptoms associated with posttraumatic stress disorder (PTSD) along with some symptoms associated with Borderline Personality Disorder.

The Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) is a comprehensive clinical instrument for assessing intelligence. It provides scores representing intellectual functioning in specific cognitive areas and a composite score representing general intellectual ability. The WAIS-IV was administered on 12/05/14. *Percentile Rank* indicates the percentage of scores that fall at or below his score compared to others of his age group in a particular area of functioning; *95% Confidence Interval* indicates the likelihood that Mr. Howells score on a particular test (mean score of 100) falls within the range of scores given; *Qualitative Description* is a way of describing his score relative to others who have taken the test. Mr. Howells scored as follows:

| Scale | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|
| Verbal Comprehension | 82 | 108-119 | High Average |
| Perceptual Reasoning | 77 | 104-117 | High Average |
| Working Memory | 13 | 77-91 | Low Average |
| Processing Speed | 5 | 70-87 | Borderline |
| Full Scale IQ | 47 | 95-103 | Average |
| General Ability | 82 | 109-119 | High Average |

*Verbal Comprehension* measures verbal abilities that require reasoning, comprehension, and conceptualization. *Perceptual Reasoning* measures nonverbal reasoning and perceptual organization. *Working Memory* measures simultaneous and sequential processing, attention, and concentration. *Processing Speed* measures the speed of mental and graphomotor (cognitive, perceptual and motor skills which enable a person to write) processing. *Full Scale IQ* is considered the most valid measure of overall cognitive ability. *General Ability* refers to one's overall cognitive ability without as much influence of working memory and processing speed.

Mr. Howell's profile suggests an above average cognitive ability that is somewhat hampered by his memory and processing speed. This comported with his self-report prior to testing in which he indicated a noticeable deficit in recalling past events as compared to others and having above average intelligence compared to others. Problems with working memory and processing speed can be due to issues with attention, concentration, and neurological deficits. Mr. Howells reported a chronic problem with spelling that resulted in him being designated as "learning disabled" and allowed him to utilize specialized technologies in college. Mr. Howell has the ability to do higher level academic work with the appropriate accommodations noted above.

The Structured Interview of Reported Symptoms (SIRS) assesses deliberate distortions in self-reporting in order to evaluate the possibility of feigning. The SIRS was administered on 11/25/14. Mr. Howells endorsed symptoms and psychological problems in a manner which is highly consistent with individuals honestly reporting their difficulties. No evidence of exaggeration or feigning was found.

Psychosexual Evaluation      Stephen Howells II      DOB ███████      Report Date: 02/18/15

The Multiphasic Sex Inventory II (MSI-II) was administered on 11/25/14. "The Multiphasic Sex Inventory II (MSI-II) is a theory based, nationally standardized self-report questionnaire designed to assess the wide range of psychosexual characteristics of the sexual offender." (Multiphasic Sex Inventory II Handbook, p.1) Mr. Howells's test results were considered interpretable and reliable and suggest that he was open and disclosing during testing.

Test results indicated that Mr. Howell was very disclosing of his sexual offending behavior and his sexual problems overall. His responses were consistent with individuals who acknowledge the full range of their sexual problems, identify cognitive distortions present at the time of their offenses, and are aware of the fantasies, thoughts, and planning involved in their offending. His profile was consistent with individuals who are amenable to and do well in treatment.

## DIAGNOSTIC CLARIFICATION

1)  Mr. Howell appears to have a long history of sexual disorders called "Paraphilias". Paraphilias are sexual disorders in which an individual shows sexual interest and arousal to things that are problematic. Mr. Howells' sexual history is consistent with someone who has the paraphilias of Sexual Sadism (sexual arousal to pain, suffering or humiliation), Pedophilic Disorder (sexual thoughts or fantasies involving prepubescent children), Fetishism (arousal to nonliving objects such as female underwear) and Frotteurism (arousal to rubbing up against strangers without their knowledge) although Frotteurism has not been an issue for some time. He does not appear to have paraphilias involving Exhibitionism (arousal to exposing one's self to strangers) or Voyeurism (arousal from watching others, usually strangers, undress or engage in sexual activity). The fact that he engaged in sexual activity with prepubescent children and viewed pornography involving prepubescent children, despite his statement that prepubescent genitalia doesn't arouse him, suggests that he has the paraphilia of Pedophilic Disorder. People with Pedophilic Disorder are differentiated from non-pedophilic child molesters in that those with Pedophilic Disorder are more likely to have boy victims, multiple victims, prepubescent victims and unrelated victims. Mr. Howell has multiple, prepubescent, unrelated victims, and therefore is more like those with Pedophilic Disorder than non-pedophilic child molesters.

2)  Mr. Howells appears to have been sexualized during his early years. While his parents disagree over the source of his being sexualized, it appears that Mr. Howells experienced a high degree of sexual information and/or experiences during his childhood. Children do not process and integrate sexual information in the same way adults do; they tend to focus on the sensations which are intense, whether positive or negative, and use them as a filter for future experiences, especially when there is a lack of guidance or help in assimilating such experiences. Mr. Howells' self-report of problematic sexual fantasies and high degree of sexual activity (masturbation, obsession with sexual activity with peers) at such an early age may have roots in earlier sexual experiences suggested but not clarified by his parents.

Page 17 of 19

Psychosexual Evaluation     Stephen Howells II     DOB: ▓▓▓▓▓▓     Report Date: 02/18/15

3) <u>Mr. Howells appears to have difficulty utilizing his working memory.</u> It is fairly common for children raised in chaotic homes with violence and/or neglect to experience memory problems due to the interference of anxiety or fear in the brain's process of integrating new information. His self-reported memory problems, consistent with testing done for this evaluation and in 2003, suggest that his memory problems are chronic in nature. This affects his ability to process new information and to compare it with information previously integrated.

4) <u>Mr. Howells displays significant personality issues consistent with Narcissistic and Antisocial Personality Disorders and to a lesser degree Borderline Personality Disorder.</u> Thinking that others have less value than one's self, manipulating others to satisfy one's desires, and believing that social rules or mores do not apply to one's self are consistent with traits found in Narcissistic and Antisocial personality disorders. While these traits enable one to engage in problematic behavior, in this case, Mr. Howells' paraphilic disorders were the main cause of his behavior, while his problematic personality traits acted as an enabler in the process. While he did not display empathy or guilt in carrying out the instant offense, his behavior in releasing the victims despite the likely outcome of detection and arrest suggests that the guilt he described may have been real. Sometimes people with narcissistic/antisocial personality traits, when confronted with the reality that their fantasies were not attained, hold on to them in a defensive manner. In this case, Mr. Howells acknowledges that his fantasies were disturbed. And while he maintained that his plan may have worked if certain variables had been different, his suggestion that he changed his thinking upon facing the reality of the girls' presentation (wanting to go home, not wanting to be with him) suggests that he does not totally lack empathy.

Borderline personality features include fear of abandonment, disturbances in identity, and mood lability born of disturbances in one's earliest relationships or attachments. People with Borderline personality features often have a history of violence, neglect or sexual abuse, and may develop posttraumatic stress disorder (PTSD) as they age. Mr. Howells displays some characteristics of PTSD in terms of experiencing intrusive thoughts (his sexual fantasies) and compulsive behaviors (viewing pornography) but it is not clear at this time to what degree these symptoms are part and parcel of his paraphilias or an attempt to self-sooth to reduce anxiety which is more in keeping with PTSD.

5) <u>Mr. Howells is susceptible to experiencing mood disordered symptoms in his current situation.</u> Mr. Howells initially experienced suicidal thoughts when first arrested and reported engaging in excessive exercise in order to cause an exacerbation of his heart palpitations. While he denies current suicidal thoughts of an active nature, he continues to experience passive suicidal thoughts (e.g., If a boulder was falling on top of me I wouldn't get out of the way). Part of his depressive reaction to his predicament is due to the fact the he believed there was no effective treatment for his sexual problems and he was fated to live the rest of his life experiencing troubling sexual thoughts and fantasies.

Psychosexual Evaluation       Stephen Howells II       DOB: ▓▓▓▓       Report Date: 02/18/15

## FUTURE CONSIDERATIONS

Mr. Howells is a 39 year-old Caucasian, divorced male who is currently incarcerated and awaiting trial for sexual offenses involving the kidnap and sexual abuse of young girls. He is educated with above-average intellect despite having chronic problems with spelling in the context of issues with working memory and processing speed. He also has chronic problems associated with paraphilias, problematic personality traits, and appears to have current and recent issues with mood management and possibly some symptoms of PTSD.

The Federal Bureau of Prisons currently offers treatment to inmates guilty of sexual offending housed within the federal correctional system. Current treatment modalities in the federal system include cognitive-behavioral therapy to address cognitive distortions associated with sexual offending and pharmacological treatment to address sex drive reduction. Pharmacological treatment, also called Anti-Androgen Therapy (AAT), provides medications that reduce testosterone, which studies have shown to decrease sexual arousal and sexual fantasies including violent fantasies. AAT and other pharmacological treatments for sexual offenders tend to be used with individuals who have multiple paraphilias and can tolerate the significant side effects associated with the medications. Such interventions have been used successfully with individuals who have experienced paraphilias as long-standing and problematic as Mr. Howells; for example, the New York State Office of Mental Health (OMH) utilizes AAT with sex offenders determined to have a "mental abnormality" and considered to be a danger to others during inpatient treatment and released into the community including some with particularly violent sexual histories.

Mr. Howells' presentation during interviews and test results indicate that he is motivated to obtain treatment for his problems, is highly disclosing of his problems, and displays characteristics associated with those who engage in treatment in a meaningful manner.

In the event that Mr. Howells required additional treatment in a secure treatment facility at the conclusion of his sentence, the federal government could file a petition known as a *Certification of a Sexually Dangerous Person*. This would allow the government to commit Mr. Howells to a federal treatment facility on an involuntary basis following his sentence to receive further treatment.

This opinion is based on current available information and is subject to change in the event of additional information becoming available.

Erik N. Schlosser, Ph.D., ABPP
Licensed Psychologist
Board Certified in Forensic Psychology

# FOOTNOTE 4

Feb. 7, 1990

Mrs. Monroe,

Please do not allow any of the Howells children to talk on the phone with Mr. Stephen Howells, Howard Runck or Mr. Howells Lawyer (may be David Garner?). And please do not allow them to leave the school with any one except me. If I have to have someone pick them up I will send a handwritten note with the person. Thanks so much for your co-operation

Sincerly

Vera Carpenter



November 2, 1988

School Nurse
Colton-Pierrepont Central School
Colton, NY   13625

Dear Ma'am:

I have four sons enrolled there this year; Stephen, Jr., Carl, Elon
and James Howells.  Their mother is Vera Carpenter.  I have some concerns
about the well-being of my boys and my attorney, David Garner suggested
I write you.

Vera and I separated over six years ago, which ultimately resulted
in divorce.  I had a good job opportunity in Colorado and relocated here.
Vera prevented me from having any contact with my children, so I went through
Family Court in Canton in 1985 and was given visitation rights January, 1986.
The boys have spent the last three summers out here with me and I was back
to visit them in New York twice.  I had a phone installed where they lived
before moving to the Colton area and was able to keep in contact with them
that way.  However, now that they have moved to a remote area where the
telephone company is unable to provide service, I have very little contact
during the school year.

My main concern right now is if the boys are well and in good health.
Vera had a tendency to neglect their personal care and meals, which was a
big factor in our separation.  Because of this neglect, I at first felt I
should go for custody and the resulting custody studies by Social Services
here and in Canton agreed I would give them better care.  However, my boys
were going through such emotional upheaval about possible permanent separation
from their mother, I felt it in their best interests to stop the custody
proceedings and settle for visitation and continued contact with them.  The
Court Order states that Vera is to have them keep in frequent contact with
my by phone and letters, but in their present living situation, this is
not being done and I'm quite frustrated as to how to work this out without
going back to Court.  I have promised my boys I will not go back into Court
as long as I am able to have contact with them and they are able to visit
me here in the summers.  Since I have infrequent contact with them now, I
plan to visit them during Spring Break back there.

With this background, would you be so kind to let me know if the boys
are doing all right in school and are well.  Stephen and Carl have each
failed a grade twice and Elon failed last year.  They are intelligent boys,
but are never given any incentive to do their home work.  I have set up a
plan of paying them for good grades, which helped Carl improve especially.
Social Services was monitoring Vera's care of the boys for the first two
years following Court, and they sent me copies of the boys grades.  They
have discontinued the monitoring, so I no longer know how they are doing
academically during the year.  Stephen has always had a tendency to have
high absenteeism from school and Vera never been too concerned about
that, so hope this is improving.

I pay monthly child support, plus Social Services makes up the difference
with AFDC.  They did a home study at my request of the present living conditions
and wrote me that it was minimal, as there is no electricity or running water,

(continued)

Page 2

but indicated that they would not take any action at this time. They did not indicate that they had any knowledge that a man was living in the home with Vera. This brings me to my second concern. From what I have been able to determine, no one in the area knows this Guy Wallace that Vera is living with, as he is fairly new to there. This is at least the fourth man she has lived with since my leaving the home and one of those men was quite abusive to the children. In fact, if he had not moved out during my Court hearings, I would have continued pursuing custody, as Social Services had investigated reports of his abusing the children, with counseling and warnings to Vera being the result. I have some real concerns of possible physical, emotional and or sexual abuse, as I am unable to find out anything about this person. James in particular has had something happen to him in the home when he was very small, as he has the idea I was "mean" to him and "hurt" him when he a year or so old, even though I left the home right before he was born.

The only reason I am telling you about these personal things is that they have no guidance at home on hygiene and cleanliness and all four told me last summer that they were not very well liked at school because they were dirty and called "welfare kids". While they are with me, I do what I can to teach them personal hygiene and have clean clothes for them every day. I try to impress the importance of being neat, but they say their mother and grandmother tell them there are more important things in life and not to worry about what others say. James started wetting his pants last year and I can imagine he goes to school smelling quite bad. His bed wetting and pants wetting during the day has some cause, but I don't know why. I know that it lessened a lot while he was here.

I'm enclosing a S.A.S.E. with the hope that you can at least tell me how the boys are doing in school. I realize that you are not in a position to get involved in their lives outside of school hours, but I know they need some counseling and help in school to help them get through the year without too much shame and degradation. I would also appreciate very much a school calendar or the dates of Spring Break and when school is out. I buy their airline tickets right after the first of the year, as I get a very discounted price then, so need to know the last day of school.

I appreciate very much anything you can do to help my boys and would appreciate a reply from you very much.

Sincerely yours,

Stephen Howells, Sr.

P.S. If anything urgent comes up, my work phone is █████████and my home phone ██████████████



January 31, 1989

Joyce J. Monroe, Supt./Principal
Colton-Pierrpont Central School
Colton, New York   13625

Dear Ms. Monroe:

I had a telephone conference yesterday with my attorney, David Garner, and he suggested that I write you again.  I have not heard from any of my boys since October and I'm very concerned about how they are faring the winter with living conditions, health and school.

My mother lives in Brushton and last saw the boys in October.  She normally has them for the week after Christmas, and this year, since they did not have a phone, she had written their mother, Vera, about the usual visit and to inquire if Vera was bringing them to Brushton or if she should come get them.  She received no reply and still has not heard anything from them.  In the past, Vera has had a tendency to avoid all family (hers and mine), when there are problems at home, so my mother is also very concerned.  She is afraid to try and go back into the woods alone where they live during the winter.

I had sent toys, winter shirts, thermal underwear and socks at Christmas and don't even know for sure if they got them.  I had sent checks for school grades and the children did endorse those.  Other than that, we don't even know if the children are still in your school district, as Vera has moved from school to school in the past.

Mr. Garner suggested that I ask you if the school nurse could make a home visit.  The school nurse at Edwards-Knox in Russell made a home visit the first time they were in that school and found conditions at home deplorable.  The school notified Social Services and the caseworker went in and did some parenting and work with Vera.

Social Services did make a home visit last Fall to where my boys live now and wrote me that living conditions were adequate, but "minimal".  To my knowledge, they have not been back since.  They did not indicate that a man was living in the home.  Also, Family Intake Services had an appointment with Vera about having the boys keep in touch with me.  They wrote me that they were unable to get much cooperation or commitment from her, as her reply was that she would not "force" the boys to call me if they did not wish to.  They suggested I should contact my attorney and possibly Family Court.  I promised my boys last summer that I would not go back to court unless I had to, as they still had the fear I was trying to take them away from their mother and they would never see her again.  This has **never** been my intention, even though I find it difficult to accept her lifestyle.

I know my children well enough that I find I am  unable to accept her reply, as when I talked with them frequently last year by phone, our conversations were always open, friendly and warm.  James and Elon are not old enough to be making decisions like that and I know they would not refuse to call me unless there was a lot of negative reinforcement as to why they should not.  I know for certain that Carl would talk to me readily, as the last time I had talked with him in October at my mother's place, he asked all about things here and said he couldn't wait until next summer's visitation here.

Stephen Howells                                      Page 2

    Vera has told the boys from the time of our separation that living conditions at home have been my fault and when things go bad for them at home, I feel they do build up some resentment.  As they grow up, they will see that Vera's lifestyle has been that way since her childhood.

    I am sure that you have enough problems with administration of the school, but would you let me know if my boys are well and attending school?  Also, is there any possibility that at some pre-determined time,    I could call Stephen or Carl at school to just see how they are and let them know how much I care and see if they need anything?   You may wish to check with Mr. Garner about this first.

    Thanks again very much for your help and cooperation, as I love and care for my children very much, regardless of the fact that they have sometimes been led to believe the contrary.  If it wasn't for the job opportuniy I have here, I would not be so far away.  I appreciate any help you can give me on this.

Sincerely,

Stephen M. Howells, Sr.

xc: Attorney
    Family Intake Services-Probation Department
    St. Lawrence Co. Dept. of Social Services

# FOOTNOTE 6

Health Report

Re:   Stephen, Carl, Elon and James Howells
Date: November 16, 1989
From: Kathryn Hayes

These boys appear to be in good physical health.  However,
due to their personal hygiene they are encountering some
problems.  The habit of odor, particularly of urine, is
causing some difficulties with their peers.   The
matter of providing proper clothing is also of some
importance since in this very cold climate we worry about
colds, flu, etc.   This week on two days the boys arrived in
such a state, consequently that we provided them with showers
and clean clothing.

James's wetting is improving and we do keep additional
clothes for him to wear on the days he wets.  The school
physician has examined him and does not perceive at this
time that the wetting stems from a physical reason.

# FOOTNOTE 7

TO

*Mrs. Howells* (handwritten)

NORMAN WHYTE
HIGH SCHOOL PRINCIPAL

POSSIBLE DAYS *117* THROUGH *3/10/90*

FOLD

SUBJECT:  ATTENDANCE REPORT TO PARENTS

THIS IS TO INFORM YOUR THAT YOUR SON/DAUGHTER *Steven* EXCEEDS THE ATTENDANCE LIMITS SET BY THE COLTON-PIERREPONT CENTRAL SCHOOL.  IF THIS ABSENTEEISM EXCEEDS 15% IN JUNE OR AT THE END OF A SUBJECT SHE MUST APPEAR BEFORE THE ATTENDANCE COMMITTEE FOR APPROVAL TO TAKE FINAL EXAMS...... WORK BEING MADE UP WILL NOT EXCUSE HIM/HER FROM THIS MEETING.

SUBJECT: *Social St. 9*_____ ABSENT *18*___ %ABSENT *15%* WORK MADE-UP_____

SUBJECT: _____ ABSENT_____ %ABSENT_____ WORK MADE-UP_____

SUBJECT: _____ ABSENT_____ %ABSENT_____ WORK MADE-UP_____

SUBJECT: _____ ABSENT_____ %ABSENT_____ WORK MADE-UP_____

SUBJECT: _____ ABSENT_____ %ABSENT_____ WORK MADE-UP_____

## SPECIFIC ATTENDANCE INFORMATION:

1.  Minimum attendance for each class is required as a condition for receiving a passing grade or for permission to take a final exam (admission to final exams and/or Regents exams will be granted by the principal to those who have completed the course of study leading to the exam, this includes attendance).

2.  Any student with absenteeism in excess of 15% of the total number of class periods per subject will not receive credit for that particular course or courses.

3.  Periods absent, however, can be made up in two ways:  (a) by spending an equivalent number of 9th periods in relation to the class periods missed, working on course related material.  This may also be interpreted as the teacher certifying that all missed work has been made up; (b) equivalent time made up will be credited to the student.

4.  The parents of a student who is absent without authorization will be notified in writing after each absence.  A student and his/her parents will also be notified by the respective attendance office by letter when s/he is at about the midway point in absenteeism.  The student and his/her parents will be advised at that time that a parent conference is suggested to discuss the student's absenteeism and the possible ramifications of future absences.

5.  A committee will be set up, made up of respective attendance office administration, a guidance counselor, two teachers, and a parent, which will review an individual case when a student feels there are special circumstances which should be taken into account.  The committee's recommendation will then be forwarded to the building principal for action.

6.  All absences, legal or illegal, including suspension, will be included in the total number which may lead to the loss of credit.

## ATTENDANCE REVIEW COMMITTEE:

Miss Katheryn Hayes – Attendance
Mrs. Arlene McEwen   – Attendance
Mrs. Jackie Pinover  – Attendance
Mrs. Kathi Champney  – Teacher
Mr. Donald Tompkins  – Teacher
Mrs. Mary McKinley   – Parent

NORMAN WHYTE – CHAIRMAN, NON-VOTING

Attendance Policy approved by the Board of Education at their regular December 20, 1982 meeting.

# FOOTNOTE 8

·1/17/90

Carol Pierce                      permission
to transfer Stephen, Carl, Eron, & James
Howells from Colton-Pierrepont Central
to Hermon-DeKalb Central as the boys
are now living with her.
                    Sincerely,
                    Vera Carpenter


Carol & John Pierce have my
permission to authorise any and
all medical care in my absence for
Stephen, Carl, Eron, and James Howells.
                    Vera Carpenter
                    4/17/90

# FOOTNOTE 9

CUMULATIVE HEALTH RECORD

Name *Howells, Stephen*        Sex *m*

Date and Place of Birth _____

Approved As To Content By New York
State Education Department - June 1970

| Parent or Guardian | Address | Phone |
|---|---|---|
| 1 *Vera Carpenter* | Rd. 1, Box 146  Russell | |
| 2 | Box 222  Colton  Wilson Rd. | |
| 3 | N.Y. | |

| School Name and Location | Family Physician | Phone |
|---|---|---|
| 1 *Edwards-Knox Central E. 9/6/84 (478a)* | | |
| 2 | | |
| 3 *Colton Pierrepont Central School* | | |

### History

| | Date | | Date | | Date | | Check |
|---|---|---|---|---|---|---|---|
| Anemia | | Heart Disease | | Rheumatic Fever | | Asthma or Allergies | |
| Chicken Pox | | Measles | | Scarlet Fever | | Ear Conditions | |
| Diabetes | | Mumps | | Tuberculosis | | Frequent Colds and Sore Throats | |
| Epilepsy | | Nephritis | | Contact With TBC | | Operations | |
| German Measles | | Pneumonia | | Whooping Cough | | Serious Injuries | |
| Any Serious Illness Other Than Above | | | | | Details, if pertinent: | | |

*1989-1990*
*Learning disabled*

In  Emergency  Notify-

### Medical Examination (Use Medical Code)

| Date | 11/6/8 | 10/88 | 10/89 | | Legal requirements for immunization waived because of: | | | |
|---|---|---|---|---|---|---|---|---|
| Age | 11 | 12 | 13 | | | | | |
| Grade | 4 | 6 | 7 | | A. Parent's religion | | ☐ | |
| Eyes | | | | | B. Physician's certificate | | ☐ | |
| Ears (Otoscopic) | | | | | | Date | Date | Date |
| Lymph Nodes | | | | | | | | |
| Thyroid | | | | | | | | |
| Nose | | | | Smallpox | | | | |
| Tonsils | | | | Polio | 11/75, 11/76 | 3/79 | 8/80 | n/83 |
| Teeth | | | | Measles | | 8/78 | | |
| Heart | | | | German Measles | | 8/78 | | |
| Lungs | | | | Diphtheria | | | / | |
| Hernia | | | | Tetanus | | | / | |
| Genito-Urinary | | | | Whooping Cough | | (B) | 3/90 | |
| Ortho-pedic  Structural | | | | DTP | 9/25 | 11/25 | 3/79 | 8/80 |
| Posture | | | | Mumps | | 8/80 | | |
| Feet | | | | Tuberculin Test | | | | 1/90 |
| Skin (Non-Commun.) | | | | Chest X-Ray | | | | |
| Epilepsy | | | | Preschool Vision Exam | | Scoliosis Scr | | |
| Nervous System | | | | | | | | |
| Speech | | | | | | | | |
| Nutrition | | | | | | | | |
| Other | | | | | | | | |

Signature of Physician _____

*ok 86-87*

### Screening Procedures

*Howells, Stephen*        8788

| Date | 10/26/84 | 3/9/82 | 10/88 | 10/89 |
|---|---|---|---|---|
| Height | 57 3/4 | 59 1/2 | 62 | 61 1/2 |
| Weight | 80 | 96 1/2 | 103 | 127 |

| V I S I O N | Date | n/10/84 | 3/9/82 | 10/88 | 10/89 |
|---|---|---|---|---|---|
| | With Glasses  R | | | | |
| | L | | | | |
| | Without Glasses  R | 20/20 | 20/20 | 20/20 | 20/20 |
| | L | 20/20 | 20/20 | 20/20 | 20/20 |

Plus Lens Test:        Color Perception:

| H E A R I N G | Date | n/10/84 | 3/9/82 | 10/88 | 10/89 |
|---|---|---|---|---|---|
| | Sweep Check  R | 25 | | SL 25 | SL 25 |
| | Test  L | 25 | 25 | SL 25 | SL 25 |
| | Threshold  R | | | | |
| | Acuity  L | | | | |

Teeth _____

*Urine-N*
*pH 5.0*

*Medical Code (Use above in recording medical examination findings):

| | | | |
|---|---|---|---|
| Blank | -No Defect | 1 | -Irremediable Defect |
| X | -Observation (Not Reportable) | SR | -Supplementary Record |
| XX | -Report and Follow-Through | T | -Under Treatment or Treated |
| XXX | -Report and Immediate Follow-Through | | |

**Dental Code: XX - 1-8 Carious Teeth: XXX 8 Or More Carious Teeth (Dental Hygiene Teachers Record)

Medical Recommendations (including Special, Employment, and Athletic Examinations)

SCHOOL NURSE-TEACHER NOTES

10/30/76 Body not clean, nor
are clothes. Talked z pupil
about it. He says he just
doesn't have time to clean
up in the morning.
                    C.T. Muller SNT

3/11/83 Injury to rt. leg
at home last night.
Went to E.R. (Potsdam)
X-rays taken - no fracture
Sprain. On crutches. No
gym for 1-2 wks.
                    C.T. Muller SNT

A transcript of this record must be forwarded when the pupil moves out of the district.

# FOOTNOTE 10

Dear Judge Suddaby,

Stephen Howells II is the oldest of four boys raised by our mother Vera Carpenter after being abandoned by our father Stephen Howells Sr., around the time Stephen entered grade school. Stephen was the oldest and as such filled the role of head of the household, second to our mother and he had responsibilities for taking care of his younger brothers. We grew up poor and lived in a number of towns in St. Lawrence County (Potsdam, Canton, Hermon, Russell, Colton/Pierpont, and Parishville) until we graduated school, but we were richer than most kids because we had a strong family bond. We were tested by bullies at school, society and even internal family struggles. We were sons of two families, we grew up interacting with our mother's family the most and of course our upbringing was looked down upon by our father and a few members of his side of the family. We were four independent boys, we fought with each other like cats and dogs, but it was just young men trying to establish ourselves in a pecking order and learn the ways of the world. We drove our mother crazy and at times she felt like she was not doing a good job, but for us boys we did not see it as a problem because deep down we were brothers. I express the bond we share by saying "blood is thicker than water; aunts & uncles, cousins, friends, girl friends and wife's will come and go, but family is forever and no matter what happens in this world nothing can change that...we are blood and we will always have each other." Our childhood was a struggle, but it made us stronger men.

Stephen and I are only two years apart, so naturally we did a lot of things together like bike riding, Boy Scouts, camping, hiking, building forts, horseback riding, doing house & farm chores, hunting, fishing, soccer and looking out for our younger brothers. Stephen and I worked for our Grandfather, Carl Carpenter, for a number of summers, as beekeepers, and our Grandfather taught us the value of a full day's work, patience, manners and how to listen. Our relationship changed the day Stephen went off to Roberts Wesleyan College, because he was no longer my boss and we were equal friends. In 1996 I talked Stephen into joining the United States Air Force, he left for basic training on Christmas Day that year and I followed just over a month later when I graduated high school 6 months early. We ran into each other in basic training when Stephen was assigned as dorm guard for my flight. Then during our technical training schools we were able to visit with one another and go sightseeing in San Antonio, Texas. We both got stationed in Japan, Stephen on Okinawa and me up north at Misawa. During our time in Japan we got to visit each other's bases and interact as adults and friends. Stephen served his country honorably for just over 5 years and separated as a Senior Airman (E-4) at his second duty station, Travis Air Force Base, California. After the military Stephen returned to St. Lawrence County, with his wife and newborn daughter, and went to college for nursing. Stephen spent several years as an ER nurse and filled several other nursing positions in Governor, New York. While I have continued on with my Air Force career, achieving the rank of Master Sergeant (E-7) and serving in Delaware and overseas in Afghanistan, Qatar, Japan, Korea, and Germany. Out of my 19 years in service I have spent 15 years as a supervisor and leader while serving as a Non-Commissioned Officer and leading a couple hundred men and women.

Stephen was known to me as being a hard worker, a good father, a leader and a professional. He was a respectable member of the community who had changed his station in the world though education and hard work. From the outside he had a good life, was building a future for himself and Nicole and had become successful. Stephen has three wonderful children who will now grow up without a father, three brothers who will grow old without our family anchor connecting us to our roots in St. Lawrence County and a mother that will more than likely pass away before Stephen is even close to be eligible to leave prison. With the minimum sentencing laws Stephen faces at least 30 years to an unimaginable multiple life sentences if given the maximum. Judge Suddaby I am asking you to be lenient and allow Stephen to serve concurrent terms, so that he will have a possibility of leaving prison someday. I do not ask for leniency for Stephen himself, but for his family, and his kids who will have families of their own 30 years from now.

Stephen's family and especially his three children, suffer more by having him in prison. I ask that you think about his kids growing up without their father and how that will affect their lives. It is obvious that Stephen did not take them into account, so I ask you to on their behalf.

Very respectfully,

Carl Edward Howells

Dear Judge Suddaby,

Stephen M Howells II, is my oldest brother, being that he is seven years older than myself, I have known him my entire life.  Growing up he was forced to help care for us after our father, Stephen Mirl Howells I, abandoned our family, a task that he took to passionately, teaching us everything a father normally would have.  Stephen taught me how to ride a bike, shoot a gun, archery, and how to fish, as well as many other things.  He was also more of a father to me because he was seven years older than myself and was our primary babysitter when my mother was working.

Growing up Stephen always did everything he could to protect us from anyone else harming us like bullies at school, the aunt we lived with for two and a half years, Carol, who was viciously verbally abusive the entire time we lived with and our father, who has a very violent temper and beat our mother while they were married, and while we visited him at his house in Colorado, sexually abused me on numerous occasions, and I believe my other brothers as well.  When it was discovered that my father had molested me, my bother Stephen did what he could to keep me from having to be alone with him when he could while we were continued to be forced to visit him against our will.

Throughout the year I worked with my grandfather, Carl Carpenter, beekeeping with all of my brothers.  During the summer we would work the bee yards and the Honey House.  When I was younger, Stephen was in charge of the Honey House when my grandparents weren't there, Stephen reinforced my Grandfather's lessons about the proper method to beekeeping, teaching me until, eventually, I was left in charge of the Honey House when my grandfather left.  In the winter when we visited we would build frames and hive boxes as well as wiring and setting wax foundation into new frames to be used in the Spring.

Since growing up Stephen has thrown himself into providing for and raising his children, working to raise them with the same rural experiences I had growing up from him to have the knowledge to provide for themselves when they are adults.  Your Honor, I am asking for leniency for my brother so that he has an opportunity to be present in his children's life and my family's as well in a more tangible manner.  Through Stephen's recent actions he has shown his remorse regarding his crimes, taking responsibility by pleading guilty and sparing the state and others involved from having to have a drawn out trial.  He has thrown himself onto the mercy of the court and I ask that you show him that mercy by giving his family an opportunity to known him again outside of prison.

Thank you for your consideration in this matter,

08/12/15

To whom this may concern:

I have been asked to write a letter describing Stephen M. Howells II as I knew him.  When I met Steve, he was a medical technician in the US Air force.  He told me parts of his hardship growing up with his mother.  He told me how his mother dropped him and his three brothers at his aunt's house and a year later they were still there.  He told me how he went and stayed at a teacher's house for a while and how finally when he was able to get a hold of his mother, convinced her to get all his brothers back together and live together.  I saw commitment to family. He spoke highly of his grandparents on his mother's side.  I saw a man with potential, a loving heart, and smart, compassionate. He wanted to improve himself. He was honorably discharged from the Air Force. Once out of the air force, he wanted to get a good job and start a family with me.  We married in Okinawa.  We moved to California while in the Air force. He was very supportive, and loving. He was getting out of the Air force and wanted to find a job to help support our new family.  He left for St. Lawrence, NY. He came back to California to be with me when I delivered our first born child. He was there for all three of our children.  He made me feel safe and secure throughout our marriage. We drove from California to St. Lawrence County, NY to raise our family in a safe area.  He went to college and succeeded in getting his nursing degree. Along the way, he worked in different healthcare jobs so that he could support our family.

After our third child was born, he started changing, not listening to me, became angry over anything.  He was playing on his computer more often, interacting with other people through the internet.  Slowly, his inhibitions starting going out the window. He would come out from the office for five minutes, show his presence, and then go back into the office.  After an episode where he was aggressive with our youngest son, I confronted him. He said he had been cheating and had found someone else.

Throughout the separation and finally divorce process, he would look at me with hatred. Our child custody agreement changed to every other week with our children.  I was hurt and happy for our children that they were able to spend time with their father. Then the complaints began from our children, they were surviving there, safety concerns over supervision surfaced. They went back and forth for a year. The two youngest ended up having to repeat their grade. Our oldest became depressed. Steve was not taking care of our children properly, was unwilling to work cooperatively with me to make sure our children succeeded in school, or home.

After he was taken to jail, it took close to a year until he decided to own up to his crime. He wrote a few times. Once he owned up to his crimes, we went to visit him in jail.  My children needed some type of assurance that their father was alright. They also needed to know that he was in jail for a crime.  He was upfront that he committed a crime and needed to pay for his crime. After a month or two, he wrote that he had found God and was reading the bible. When we visited him again, I saw the man that I knew a long time ago. The one that had a fear of God. The one that was caring, and loving, and honest with himself and with our children.

He had an addiction with computers which slowly led to his loss of knowing right from wrong.  He committed crimes that he needs to pay for.

Steve has been in jail close to a year, I have seen a change in him since my children and I first visited him beginning in May 2015.  I feel he needs counseling for his addiction because it led him down a self-

destructive path that hurt a lot of people.  He had a lot of potential and chose to disregard the people that loved him and cared for him, his family. I feel that after a lot of self-reflection, he may have come to realize the true loss of his actions.  Does he have the potential to become a viable member in the community again after serving jail time?  That will be determined with the choices he makes and the actions he takes. All I can hope for is that this time he considers how his actions will affect our children and act accordingly.

Sincerely,

Maryann Howells

08/12/15

Dear Judge Suddaby,

Stephen is the oldest of my four sons.  I separated and divorced their father when Stephen was young, early elementary school.  Stephen was my "right hand man" and was very responsible for his age.  He helped supervise his three younger brothers, and helped to manage the household, as I often had bouts of exhaustion and depression.  I have recently ( in the last five years) been diagnosed with anxiety/depression disorder and PTSD brought on by the violence and emotional torture during my marriage, and the years of stress from fighting through the courts to keep my sons away from their abusive father.  I relied on Stephen the most to help around the house and to keep track of his younger brothers.  He willingly took on these responsibilities and did a great job.  Later in life his brothers have all expressed gratitude for the things he did for them.

Stephen struggled through school until he was diagnosed with a spelling disorder, (he spells phonetically).  When the teachers stopped grading his spelling and only considered the content of his papers, his grades skyrocketed.  Stephen rode horses, enjoyed hunting, fishing, camping, worked in the vegetable gardens and for his grandfather as a beekeeper.  He was also in Boy Scouts, and played on the soccer team at school.

Stephen attended college for a year then joined the Air Force, becoming an Aero medic.  After five years in the Air Force he was honorably discharged and went back to college, first for his LPN, then his RN.  He worked as a nurse in both Gouveneur and Ogdensburg hospitals, where he spent the majority of his years in the emergency room.

Stephen married and had three children; Alexandra, Michael and Daniel, he was a good father and fought to stay in their lives.  He taught them gardening and beekeeping. When I lived in Hermon Stephen would often come over to help me to get hay, shovel off my roof, and rototill my garden.  When I moved to Texas, he took his vacation days from work to drive me and my truck to Dallas.

The thought that he will miss his children growing up, may never be able to walk in the woods or have a garden again breaks my heart.  He is my son, I raised him, his successes are my successes, and his failures are my failures.  I have nothing to show for my life, except my children.  I beg you for leniency and concurrent sentences, so that I might be able to hug him again.

Most Sincerely,


Vera C. Carpenter

Dear Judge Suddaby,

      Stephen is my oldest brother and we are six years apart, so growing up he was like a father figure for me.  Due to our age difference we did not hang out together or anything like that, but he was nice to me and I have fond memories of him.  I remember him taking us hiking, fishing, riding four wheelers, and building my younger brother James and I a bike out of old spare parts.  During our court ordered visitation, Stephen would keep us safe as we flew from New York to Colorado, and then keep track of us during our month long visits with our father and his partner Howard Runk.  Stephen would also watch us after school when our mother was attending college or out of the house.  I remember that he was a good cook and would make us special dinners from time to time and would surprise mom when she got home.

      Due to our age difference and Stephen moving out to attend Roberts Wesleyan College, while I was in junior high school, and him going off on a career in the United States Air Force a year or so later, I ended up having limited contact with him after that.  My mother, brother James and I moved to Montana and I have spent these years doing various jobs in landscaping and construction across several western states, and I have been a certified crane operator for the last five years.  Our contact after Stephen left home was mostly just a few phone calls and a visit or two over the years.  I also kept up with him and my other brothers on social media, but each of us have lead separate lives.

      Stephen was a hard worker, he went to college and became a Registered Nurse, a profession that I hold in high esteem.  To me he looked to have a good life, a bright future and three wonderful kids.  Your Honor, I ask you for leniency in the sentencing you impose by granting concurrent sentences.  I do not ask this for my brother Stephen, but for his children who will be middle aged adults with families of their own, 30 years from now.  I ask you to think about Alexandra, Michael, and Daniel when you make your sentencing decision.  Please give his children hope that they may be able to see their father outside of prison someday.

Very respectfully,

Elon Robert Howells